Berlick vs. Ashland Sulphite & Fiber Co.

BERLICK, Respondent, vs. ASHLAND SULPHITE & FIBER COMPANY, Appellant.

*May 5 — May 22, 1896.*

*Master and servant: Personal injuries: Contributory negligence: Co-employees: Evidence.*

1. In an action for personal injuries sustained by plaintiff while emptying a digester in defendant's pulp mill, it appearing beyond dispute that the proximate cause of the accident was the failure to put cold water into the digester so as to drain through, cool, and compact the heated pulp therein; that plaintiff, who had been accustomed to empty one or more digesters daily for a month before the accident, knew such use of cold water was required as a part of the established method of proceeding, and must have known of the danger almost certain to attend its omission; and that the

Berlick vs. Ashland Sulphite & Fiber Co.

omission in this instance was the fault either of the plaintiff himself or of a co-employee,— the verdict in favor of the plaintiff cannot stand, even though the trial court refused to set it aside.

2. There being evidence tending very strongly to show that the failure to put cold water into the digester was the personal fault of the plaintiff, it was a material error to admit his testimony that before the commencement of the action, when he applied to defendant's officers for help, they angrily refused to do anything for him, and one of them said that they had hoped he would die because they knew he would make them trouble.

APPEAL from a judgment of the circuit court for Ashland county: JOHN K. PARISH, Circuit Judge.    *Reversed.*

The plaintiff brought this action to recover damages for personal injuries received by him by and through the alleged negligence of the defendant while he was employed in its sulphite pulp mill at Ashland, Wisconsin. The defendant was engaged in the manufacture of wood pulp by cooking spruce wood chips in sulphurous acid in two large egg-shaped retorts or digesters, designated as "No. 1" and "No. 2," and the accident happened in emptying digester No. 2. This digester was twenty-eight feet high, ten feet in diameter, and made of steel plates. There were openings at the top and bottom two feet in diameter, closed by means of metallic lids pressed against the ends by bolts and nuts. The bottom of the digester was twelve feet above the lower floor of the mill, and reached by a scaffold under it, leaving a space of four and one-half feet between it and the bottom cover. Directly under the lower neck of the digester there was an opening through the scaffold to allow the pulp, when removed from the digester, to fall to the floor of the mill. The digester was charged from the top, and four or five cords of wood cut into chips were put in, and between 5,000 and 6,000 gallons of sulphurous acid, and the top cover was bolted in place. The charge was cooked by steam forced into the digester through two steam pipes, one being one foot and the other three feet above the lower neck, and took

from ten to fifteen hours, under a pressure of seventy or eighty pounds to the square inch, and at a temperature of about 300 degrees. The cooking was in charge of a man named Longren, and when it was done the steam and gases were discharged at the top, and the liquid was drawn off through a valve in the bottom cover, and conducted by a pipe outside of the mill. When the pressure was lowered to about twenty-five pounds, the cook opened the large valve on the top until all pressure was removed, and then the cover was taken off, and 15,000 to 20,000 gallons of cold water was allowed to run into the digester, work its way through the pulp, and escape through the valve and pipe at the bottom, to cool off the pulp, preparatory to its removal. This took three to four hours. When sufficiently cooled and drained, it became the plaintiff's duty to remove the pulp; he and one Reisner having a contract for emptying the digesters at $1.50 each digester, but the work was under the charge and control of the plaintiff. When the drainage from the bottom had practically ceased, he would let the bottom cover down about an inch and a half, and further drainage and cooling proceeded until the mass had become dry and cool enough to be removed. He then took to his assistance four of the men employed by the defendant, and with pieces of 4x4 scantling, about six feet long, raised the cover, which weighed 500 or 600 pounds, so as to allow the fastenings to be removed, and it was lowered to supports, and removed to one side. The drainage and cooling process, with the shape of the digester, kept the pulp together and compacted it in a body, except a small quantity on the bottom cover. The pulp was then removed by means of poles and sticks, so that it fell through the opening in the scaffold to the floor of the mill.

The plaintiff had worked, in emptying these digesters, from about September 20th to the time of his injury, October 26th. He took his contract September 20th, and emptied

from one to two daily, sometimes during the day and some-
times in the night; and the mill was lighted, the night the
accident occurred, by two hanging lamps and a lantern, as
usual. The testimony of the defendant's witnesses, four in
number, is that on the night of the accident, and before that
time, he had asked that no cold water be put in the digester,
for the reason that it made the pulp hard and more difficult
of removal, and that he could perform his work easier and
quicker if the cold water was omitted. He denied that he
made such request or statement, and testified that he did
not know whether water was put in the digester that night.
The evidence was that on the night in question no cold
water had been put into the digester, and that never before
had an attempt been made to empty a digester without
cooling the mass as described. The plaintiff had helped on
other occasions to put in the cold water, and it was the duty
of the cook, Longren, to do so, and there was evidence tend-
ing to show that it was the plaintiff's duty to assist in doing
it. On the night in question, when the pipe stopped run-
ning, the plaintiff and his assistants let down the cover about
an inch and a quarter, and the water ran then quite fast.
They left it half an hour, until it ceased, and then proceeded
to remove the cover, when the whole contents of the di-
gester, pulp, acid, and steam, came down at once, struck the
cover in their hands, and went all over the men, scalding
them badly.

The plaintiff, in his evidence, testified that when he went
to work emptying the digesters by the direction of Wild-
hagen, the defendant's superintendent, he did not explain to
him how to do the work; that he found out by seeing the
men doing it before; that it was not explained to him, nor
did he know that there was any danger in it, and he had not
previously worked in any such mill. He detailed in his evi-
dence the method that was practiced. A trolley, or plat-
form on wheels, which could be raised or lowered by a

screw, had been used to support the bottom cover in empty-
ing digester No. 1, but this device had not been put up for
No. 2.  Evidence was given that such digesters were emptied
in the Fox River valley by blowing out the contents by
steam, under a pressure of about eighty pounds of steam to
the square inch, and opening an eight-inch valve by a suit-
able device on the bottom, whereby the contents would be
forced down into a blow pit or tank; and evidence was
given tending to show that the emptying of digesters in the
manner practiced at the defendant's mill was dangerous.

Evidence was given on the part of the defendant, by its
superintendent, to the effect that, when the plaintiff began
to empty digesters, he explained about the danger, and in-
structed and personally showed him how to do it; that in
his opinion the accident was caused by the fact that they
did not put any cold water on that night, and the stuff was
too hot,— too wet and too warm.  The water is put in the
digester to cool off the pulp by a three-inch hose, connected
with a large tank on the fourth floor.  The plaintiff had
been working there four or five weeks when he was injured.
Longren, the cook, testified that the plaintiff requested, on
the night of the accident, that cold water should not be put
in, saying that he did not want to wait all the night; that
he told him none had been put in; that this was the first
time they had attempted to empty a digester without put-
ting in cold water.

The specific charges of negligence were: (1) That the de-
fendant did not furnish suitable appliances for emptying the
digesters,— did not furnish a trolley; (2) that the method
practiced was dangerous; (3) that plaintiff was wholly ig-
norant and inexperienced and did not know of the dangers
pertaining to the work, and that the defendant neglected to
explain to or caution him in this respect; and (4) that the
defendant neglected to provide him a suitable and safe place
to work.

While the plaintiff was being examined as a witness in his own behalf, his counsel was allowed, against objection, to proceed to interrogate him as to what occurred between him and Wildhagen and Greulich, the defendant's superintendent and secretary, at the mill before the action was brought. He testified that Greulich said, "What do you want here?" That he said, "I came up here for a little help from you. You folks know that I got injured in that mill, and am a poor man, and have nothing to do, and have a family, and I wish you would be so kind as to help me along;" that Wildhagen was sitting in the corner of the office, and he jumped up and came up to him talking so fast he could not understand a word, as the spit was flying in his face; that Greulich told Wildhagen to sit down, which he did, and said, "What do you want here?" that plaintiff substantially repeated his statement, when Wildhagen said, "Didn't we pay you what we owed you?" to which he said, "Yes, sir; you paid me for my labor, but you didn't give me anything to live on now." He said, "No, and you won't get it." Counsel asked if anything more was said, and he answered that he said, "Gentlemen, if you don't want to do anything for me here, you will have to settle through the court;" that Greulich got up and said, "Mr. Berlick, didn't we use you right the first day we came to your house?" that he said, "Yes;" that Greulich said, "The first day we came to see you, we hoped to God you would die in your bed. We knew you would make us trouble;" and that the plaintiff went out of the office. Timely objections were made to this conversation, and the defendant, after it was given, moved that it be stricken out as irrelevant, but the motion was denied.

When the plaintiff had rested, the defendant moved for a nonsuit, which was denied; and at the close of the evidence the defendant requested the court to direct a verdict for the defendant, which was refused. A special verdict

was found determining the issues in favor of the plaintiff, that the plaintiff was not guilty of contributory negligence, and the amount of the plaintiff's damages. A motion by the defendant for a new trial having been denied, judgment was given in favor of the plaintiff, from which the defendant appealed.

For the appellant there was a brief by *Lamoreux, Gleason, Shea & Wright,* and oral argument by *E. F. Gleason.*

For the respondent there was a brief by *Sanborn, Dufur & O'Keefe,* and oral argument by *A. W. Sanborn.*

PINNEY, J.   1. The evidence is clear that the plaintiff had been accustomed to empty the digesters used in the defendant's works, at least one or both per day, for a month before the accident, and that no injury had occurred to any one in consequence of the method practiced. Until the occasion in question no attempt had been made to empty either of them without first having filled in a great amount of cold water, so that it could drain through, cool, and compact the heated mass, in order that the digester could be emptied with safety. The plaintiff knew that this use of cold water was required as a part of the established course or method of proceeding. He could not but have known that the contents of the digester had been heated to an extremely high temperature, and of the consequent danger almost certain to attend any deviation from the established use of the cold water. The condition of the pulp, after the water is drained away so it becomes solid enough to stick in the digester, is soft and spongy, but it becomes packed so as to stay there. If sufficient time had been allowed for it to cool and pack in the digester, the use of cold water, possibly, might not have been indispensable; but this would have involved very serious delay and an important departure from the invariable method. The evidence shows, beyond dispute, that the plaintiff was impatient of delay, and

wanted to omit the use of the cold water because he could empty the digester the sooner without it. Reisner heard him tell the cook so that night, and Ducette was requested by him not to put any water in, and he told him he would have to see the cook about it. About a week before he had expressed the wish that the cook would not put any water in the digester, and two or three days before he requested the witness Dumas, who was going upstairs, to tell the cook not to put any cold water in the digester, and he said he had been telling him so a good many times, and that he did not listen to him. Longren, the cook, testified that the plaintiff told him, on the night in question, that he did not want any cold water put in the digester, and witness afterwards told him he had not put in any, and he answered that he wanted no cold water in. He testified that no cold water had been put in on the night in question. That none was put in is beyond dispute. The plaintiff had, on other occasions, assisted in putting in the water. He denied saying anything to the cook about not putting in water that night, or at any other time, and denied having any conversation with Dumas about it, or with Ducette, and testified that he did not know whether any had been put in that night or not.

It needs no argument to show that the omission to put cold water into and through the digester was gross negligence. It was, beyond dispute, the cause of the accident. There is not a particle of evidence to show that there was any other cause. The highly-heated mass in the digester had not been cooled, drained, and compacted so that the digester could be emptied with safety. This was the fault of the plaintiff or of the cook. The evidence is very clear and strong to show, notwithstanding his denial, that it was the fault of the plaintiff. If this was so, and the failure to put in cold water was the proximate cause of the accident, then, certainly, he could not recover; but if the cook, whose

duty it was to put it in, was guilty of negligence in not
doing so, then, as they were fellow-servants and co-employ-
ees of the defendant in a common employment, the negli-
gence of the cook must be allowed, in law, the same effect
as the negligence of the plaintiff, and for that reason he
cannot recover. The trial court submitted the case to the
jury on account of the plaintiff's evidence, and that they
might, perhaps, find a verdict upon it, as they did. But the
finding is so clearly against the great weight of evidence on
the question of the plaintiff's fault as to render it quite
clear that the verdict is against the merits and ought, in the
exercise of sound discretion, to have been set aside by the
trial court. In such a case, if there is any evidence at all
to support the verdict, this court cannot interfere; and if
the trial court practically abdicates the discretion vested in
it upon such matters to see that justice does not miscarry,
and the verdict is clearly wrong and against the decided
weight of evidence, this works a denial of justice; for, as
we have frequently held in such cases, this court can grant
no relief. In the aspect of the case, however, that the jury
chose to believe the plaintiff as against the four witnesses
and the circumstances tending to corroborate them, the ver-
dict cannot stand, because it is beyond dispute that the fail-
ure to put cold water in the digester was the proximate
cause of the accident, and was, in this view of the case, the
negligent omission of the plaintiff's co-employee and fellow-
servant, Longren, the cook, and necessarily defeats any re-
covery by the plaintiff. For this reason, the verdict cannot
stand.

2. In view of the condition of the evidence upon the ques-
tion whether the failure to put cold water in the digester on
the night of the accident was the personal fault of the plaint-
iff, the ruling of the court in admitting in evidence the
plaintiff's testimony as to the conversation between him and
Wildhagen, the defendant's superintendent, and Greulich, its

secretary, at the office of the company, some three months after the accident, and in refusing to strike it out after it had been given, was manifest error, prejudicial to the defendant. The evidence had not the least relevancy to any question in the case. It was utterly immaterial in all its parts. It could serve no other purpose but to excite prejudice and passion on the part of the jury against the defendant. This was its almost certain result. To allow such evidence in a court of justice to affect the rights of parties litigant is in plain violation of the rules of evidence, and tends directly to render the verdict the product of prejudice, passion, or resentment, instead of the calm, conscientious deliberations of an impartial jury; and its admission was clearly prejudicial to the rights of the defendant.

For these reasons there must be a new trial.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial.