MUSBACH, by guardian *ad litem*, Respondent, vs. THE WISCONSIN CHAIR COMPANY, Appellant.

October 15 — October 30, 1900.

*Master and servant: Personal injuries: Cause of accident: Defective apparatus: Negligence of co-employee: Evidence: Burden of proof: Court and jury: Special verdict: Instructions.*

1. In an action for injuries sustained by plaintiff while operating a wood-embossing machine, caused by an explosion of gasoline gas, which was used in heating the metal dies of the machines, a finding in the special verdict to the effect that the explosion was caused by leakage of the pipes under the floor of the small building in which plaintiff was working, which conveyed gasoline from an outside tank through the inclosed space beneath the floor and up through the floor to the machines, is *held* unsupported by the evidence, which fails to show affirmatively that there was any such

leakage and shows conclusively that there was neither explosion nor combustion beneath the floor.

2.  It having been shown that a co-employee of plaintiff was in the habit of permitting gasoline to drip from the burner of his machine after it had been extinguished, and that enough gas might have been formed in the room in that way to account for the explosion, there could be no presumption, from the mere fact of the explosion, that there was any defect in the apparatus supplying the gasoline, but the burden was upon plaintiff to show by a preponderance of reasonably direct evidence the existence and proximate efficacy of such a defect; and it was error therefore, even upon the assumption that the accident might have been caused either by a defect or by the co-employee's negligence, to submit those two possible causes to the jury, for the adoption of one or the other, as if they stood on an entire parity as to *quantum* of proof necessary to give either its legal effect.

3.  Where, as in this case, the plaintiff, upon whom the burden rests, has failed to show by any reasonably direct evidence that defendant has been guilty of any negligence which caused the injuries complained of, the court should so decide and should not, by submitting it to the jury, imply that the question is an open one.

4.  Where a special verdict is taken it is not only improper but erroneous to instruct the jury generally upon the law of the case and, especially, so as to inform them of the legal effect of the answers to the questions submitted.

APPEAL from a judgment of the circuit court for Ozaukee county: JAMES J. DICK, Circuit Judge.  *Reversed.*

Action to recover for personal injuries suffered by the plaintiff from an explosion of gasoline gas while he, as an employee, was operating an embossing machine; he then being about nineteen years of age and having been employed in the same capacity for about four months.  The building in which the explosion took place was about twenty-eight feet long north and south, by sixteen feet wide, a single story, eaves ten feet from the floor, constructed of brick.  Underneath was a space or basement inclosed by the foundation walls, some twenty inches deep, having a single opening at the south end, about eighteen inches square. The floor was double, of matched flooring, and practically

air-tight, except that it was perforated by two ⅜-inch pipes
for carrying gasoline, and two 1¼-inch pipes for carrying
steam, and a trapdoor. The holes through which the pipes
passed were just large enough to permit them to pass
through easily. The trapdoor rested by its own weight
upon the joists, leaving slight cracks or interstices around
it. At the south end of the building, and outside, was main-
tained a seven-gallon tank of gasoline, from which a ⅜-inch
horizontal pipe passed through the basement northward,
under the floor. Some ten feet from the south end of the
building was the first embossing machine, and two feet be-
yond that the second. From the horizontal gasoline pipe
in the basement vertical ⅜-inch pipes passed upward along
the side of each of these machines, and turned at about
eight feet from the floor, with a goose-neck returning to
near the plates of the machine, some three or four feet from
the floor. Within the same building was an air pump,
which was connected with the tank outside by another pipe,
so that by pumping air into the tank, up to about fifteen
pounds pressure, the gasoline was forced through the hori-
zontal pipe, and up through the vertical ones and the goose-
necks, to a burner at the end of each goose-neck. These
burners were equipped with a valve to permit or prevent
the flow of gasoline, and were used to heat metal dies to
high temperature for embossing wood. Ordinarily, one
pumping would suffice to maintain pressure for one and one-
half to two hours. The building had four windows and a
large door.

The plaintiff and one Wolf were engaged as the night
shift in the operation of these embossing machines, which
consisted in sliding pieces of wood through between a roller
and this heated die, whereby figures were embossed on the
wood. In order to heat the die, the burner above mentioned
had to be first withdrawn from a mandrel or sleeve, and
lighted, and replaced in the sleeve. To do this, the ⅜-inch

pipe, bent over in a goose-neck, was supposed to furnish suffi-
cient elasticity; but there is some evidence to establish that
the operation was not always accomplished merely by bend-
ing the pipe, but that it resulted in turning the vertical pipe
in its joint below the floor. The process of heating the die
occupied perhaps twenty minutes. Then the flow of gaso-
line was properly turned off by the valve above mentioned.
The die would retain sufficient heat for perhaps half an hour,
when the process of heating would have to be repeated. It
was not infrequent that there was some spilling of gasoline
at the time of turning it on and lighting it, nor was it in-
frequent that the operators of the machines omitted to fully
turn off the gasoline when extinguished, whereby a dripping
would result. Plaintiff testifies that he never was guilty of
such omission, but knew that his co-employee Wolf fre-
quently was, which Wolf also testifies.

On July 2, 1897, at half past 1 or 2 in the afternoon, it
was noticed by the day men that the vertical pipe supply-
ing the southmost embossing machine was loose in its joint,
and it was also noticed that the pressure gauge on the air
pump ran down more rapidly than usual, and independently
of the consumption of gasoline at the burners, from which
resulted inference of a leak in the system somewhere. A
man by the name of Anderson, who seems to have had no
particular duties, but whose trade involved pipe fittings,
was called, and attempted to tighten the vertical pipe. Not
succeeding in getting it as tight as he liked, he took it
out of the joint entirely, and covered it with white lead,
and then screwed it back, and pinched it in tight with
a wrench. This, however, did not stop, or materially di-
minish, the escape of either air or gasoline, indicated by the
pressure gauge. He therefore examined the valves in the
air pump, but found nothing to indicate defect there, and
seems to have given it up as a job beyond him. The loss of
pressure was not so great at that time but that work could

continue. Later, perhaps at about 4 o'clock, the running
down of the pressure gauge became more rapid, and, while
the day men still continued their work, they called to it the
attention of Wolf, of the night shift, when he came at
about half past 5. He accordingly went to one Charles
Holden, who is called a foreman or subordinate superin-
tendent, and told him of the trouble. There having, on a
previous occasion, been discovered a leak in the galvanized
iron tank, Holden conceived the possibility of a repetition
of such defect, and called to his aid the tinner and a pipe
setter. They took the tank, holding about seven gallons of
oil, out of a box in which it ordinarily rested, and emptied
it of gasoline; put it back in the box, filled the box with
water, and then applied the air pump, with the idea that
any holes in the tank would permit escape of air, which
would show in bubbles. In doing this they discovered some
gasoline outside of the tank, and in the wooden box, esti-
mated by one witness to be about a quart, which it is testi-
fied must have leaked in there in some way. They found
no sign of leakage in the tank, and therefore took the water
out of the box and replaced in the tank the same gasoline. It
was then noticed that the union which joined to the tank the
gasoline pipe running in under the building was wet with
gasoline, and that, in connection with the gasoline which had
dripped into the box, led to the inference that the leak ex-
isted there. The union was taken off and the threads filled
with white lead, and then put in place and tightened up, as
a result of which the escape of pressure was very much, if
not entirely, corrected. The witness Holden says that the
pressure gauge stood all right. The plaintiff says that it
still ran down slowly; but it is entirely obvious that the
condition of things which rendered necessary the aid of
Holden and his mechanics had been substantially overcome;
whereupon the plaintiff and Wolf went to work at their
machines a few minutes after 6.

Both of them had heated their dies once, and the plaintiff's die had again become cold, and at about 8 o'clock he proceeded to draw out the burner from the mandrel and to strike a match to light it. Just at this point, as he was applying the match, a terrific explosion took place, which lifted the roof of the building many feet in the air, blew out all four brick walls down to the floor, and blew the plaintiff, Wolf, and another young man who was in the building outside of it. The roof fell back almost vertically. · The machine at which Wolf was working was tipped over and torn loose from its joints to the floor. Certain pieces of wood that were piled up for the purpose of embossing were set on fire, as also a corner of the roof, but were easily extinguished as soon as the hose was in operation. The floor of the whole building was substantially in place and undisturbed but for the tilting down of one corner, where certain defective supports had given away, and the resulting tilting up of the diagonal corner. No combustion took place beneath the floor, and, upon examination in the morning, all of the joints in the gasoline pipe beneath the floor were found to be completely tight. The plaintiff received severe injuries.

It was shown by experts, substantially without contradiction, that gasoline vaporizes readily; the vapor is heavier than air, and sinks to the lowest place, like water, but, of course, with less celerity; that it, like other gases, has another property, called "diffusion," whereby some portion of it will gradually diffuse throughout the space occupied by the air, and some portion of the air will diffuse through the space in which the heavier gasoline gas settles; that the gas from gasoline of the quality used by the defendant, when mixed with atmospheric air in the proportion of ninety-five per cent. of the latter and about five per cent. of the former, constitutes a violently explosive mixture if fire come in contact with it; that the gas from gasoline, when

in larger proportion to the air, or "richer," as it is termed, burns with great violence, but does not explode; that air currents or any other fortuitous circumstances may cause, at any point in a room, a variation in the proportions of mixture of air and gas; that in half an hour there might escape from an imperfectly closed burner enough gasoline to supply vapor or gasoline gas to constitute such explosive mixture through a space large enough to cause an explosion of the violence of that in question.

It was also shown, without substantial controversy between the experts, that to fill the basement with gasoline gas to such an extent that it would force its way upward through the interstices about the pipes passing through the floor would require some barrels of gasoline, in view of the fact that there was the opening described in the wall of the basement through which large amounts would naturally escape, its tendency being to flow horizontally, rather than upward. It was shown that no unusual amount of gasoline had been put into or flowed out of the tank, the evidence being that the ordinary consumption was the tank of seven gallons twice full in the course of the twenty-four hours; that the tank had been filled in the morning of the 2d of July, and again shortly before evening, and was nearly full the next morning. There was conflict of testimony between experts as to the propriety of using white lead in jointing gasoline pipes,— it being claimed by some that it was quickly dissolved by the gasoline, so as not to be permanent; by others, that it was the usual and most effective application to those joints.

At the request of the defendant, a special verdict was taken, the questions in which material to the discussion are: "*Sixth.* Was the explosion caused by a leakage in the pipes, or from the careless handling of the burner or its attachments, connected with such embossing machine, by the plaintiff or by Charles Wolf? *A.* Caused by leakage of the pipes. *Seventh.*

Was the accumulation of gas which exploded below the floor of the building or in the room where the embossing machines were situated?  *A.* On both places." *"Eleventh.* Were the pipes or connections used for conveying the gasoline to be generated into gas so defective, at the time of the accident, as to permit the escape of gasoline?  *A.* Yes.  *Twelfth.* If you shall answer the eleventh question in the affirmative, then where was such defect, and what was the character of such defect?  *A.* Imperfect connection caused a leakage under the floor."  *"Fifteenth.* Was the defendant guilty of negligence which was the natural and probable cause of the accident, and which accident, in the light of the attending circumstances, ought reasonably to have been foreseen by a person of ordinary intelligence, care, and prudence as likely to occur?  *A.* Yes."

The defendant moved for a nonsuit at the close of the plaintiff's case, and for direction of a verdict in its favor at the end of the trial, and after verdict moved to set aside the same and grant a new trial for want of evidence, among other grounds, and to set aside the answers to the above-mentioned questions, among others, and render judgment in favor of the defendant.   All of the motions being overruled, judgment was entered for the plaintiff, from which this appeal is taken.

For the appellant there was a brief by *Van Dyke & Van Dyke & Carter,* and oral argument by *W. E. Carter.* They argued, among other things, that where the evidence leaves the actual cause of an accident in doubt the plaintiff cannot recover.  *Hyer v. Janesville,* 101 Wis. 377; *Spencer v. C., M. & St. P. R. Co.* 105 Wis. 311; *Dacey v. N. Y., N. H. & H. R. Co.* 168 Mass. 479; *Hickey v. C., M. & St. P. R. Co.* 64 Wis. 649; *Louisville G. Co. v. Kaufman,* 48 S. W. Rep. 434, 10 Am. & Eng. Corp. Cas. (N. S.), 161; *Epperson v. Postal T. C. Co.* 155 Mo. 346; *Murphy v. B. & A. R. Co.* 167 Mass. 64; *Dewhirst v. B. & M. R. Co.* 167 Mass. 402; *Ames v. N.*

*J. S. R. Co.* 46 Atl. Rep. 701; *Kenneson v. West End St. R. Co.* 168 Mass. 1; *Corcoran v. B. & A. R. Co.* 133 Mass. 507; *Deschenes v. C. & M. R. Co.* 69 N. H. 285.

For the respondent there was a brief by *W. J. & J. H. Turner,* and oral argument by *W. J. Turner.* They contended, *inter alia,* that it was the duty of the defendant to provide a safe place and safe appliances for the plaintiff to work. Hamilton, Negligence, 237. For cases of liability for injuries received on account of the escape of gas by reason of defects in the pipe, see *Smith v. Boston G. L. Co.* 129 Mass. 318; *Richmond G. Co. v. Baker,* 36 L. R. A. 683; *Jamieson v. Indiana N. G. & O. Co.* 128 Ind. 555; *Louisville G. Co. v. Gutenkuntz,* 82 Ky. 432; *Citizens' G. L. & H. Co. v. O'Brien,* 118 Ill. 174; *Blakie v. Brookline G. L. Co.* 167 Mass. 150; *Ohio G. F. Co. v. Andrews,* 29 L. R. A. 337, and note. If the negligence of the defendant combined with the negligence of Wolf caused the injury to the plaintiff, the defendant is liable in this action. *Sherman v. Menominee River L. Co.* 72 Wis. 122; *McClure v. Sparta,* 84 Wis. 269; *Cowan v. C., M. & St. P. R. Co.* 80 Wis. 284; Beach, Contributory Negligence (2d ed.), § 304; *Stringham v. Stewart,* 100 N. Y. 516; 7 Am. & Eng. Ency. of Law (1st ed.), 828; 1 Bailey, Master & S. §§ 982, 984.

Dodge, J. The first and principally argued contention is that there was no evidence from which could have been reached a finding of negligence on the part of the defendant proximately causing the explosion in question. The plaintiff's theory, and that upon which alone the verdict in this case rests, is that a leak existed in the pipes under the floor, from which enough gasoline escaped to supply vapor to fill the basement and make its way upward through the interstices in the floor, and to mix with the air in the required proportion to form an explosive compound in the embossing room. There is certainly no direct evidence

to establish this theory, unless the very fact of explosion necessitates such conclusion.  There is no evidence that there was any leak in the basement.  True, the looseness of the vertical pipe in its joint below the floor might have resulted in a leak, and the air gauge indicated an unusual escape somewhere in the pipe system, but the facts disclosed negative the conclusion that any leak at the loose joint was responsible for falling pressure on the air gauge; for when that joint was tightened — and, according to the undisputed evidence, it was completely tightened, at least temporarily — the pressure gauge continued to fall as before.  On the other hand, the later investigation did discover a leak about the union connection with the tank outside, which accounted for the conduct of the pressure gauge.  Not only was there absence of affirmative proof of any escape of gasoline in the basement, but the theory of a volume of either inflammable or explosive gas existing there was negatived beyond controversy by the physical fact that neither explosion nor combustion there took place.  The same interstices through which the gas must have made its way from the basement to the floor above, upon the plaintiff's theory, would inevitably have carried the flame from the floor above to the gas below, and caused either explosion, if the proportion of gas to air was small enough, or combustion of great violence.  This physical fact of absence of explosion or combustion below the floor is such as human testimony, opinion, or theorizing cannot overcome (*Cawley v. La Crosse City R. Co.* 101 Wis. 145), and of itself is sufficient to defeat the plaintiff's theory submitted to the jury by the sixth interrogatory and adopted by them.

Apart from this complete negation of the theory of escape of gas from a defect in the pipes under the floor, the question whether such escape was responsible for the explosion and plaintiff's injury was so without evidence to support an affirmative answer that it should not have been submitted

to the jury. If, indeed, it had appeared that presence of gas in the room where the embossing machines were, such as to cause this explosion, could not have existed, or, perhaps, ordinarily would not have existed, but for some defect in the apparatus which ordinary care could have guarded against, the jury might have been justified in ascribing the plaintiff's injury to the defendant's negligence, upon the doctrine of *Cummings v. National F. Co.* 60 Wis. 612; and *Carroll v. C., B. & N. R. Co.* 99 Wis. 399. That doctrine is that where both the apparatus and the operation of it are in the control of the defendant, and the accident is one which ordinarily could not happen except by reason either of defect in the apparatus or negligence in its operation, a presumption of one or the other arises sufficiently from the happening of the accident to justify a verdict against the defendant. But in this case, by uncontradicted evidence, it is established that there was another and entirely adequate cause which might have accounted for the presence of the explosive gas, namely, the habit of the co-employee Wolf to permit a slight flow of gasoline from his burner after it was extinguished. This gasoline, dripping from the end of the burner upon the heated iron, would, of course, be vaporized with great rapidity, and there is uncontradicted testimony that enough gas might thus be formed in half an hour to fully account for the explosion. Considerably more than that time is shown to have elapsed with the burners extinguished, after the plaintiff and Wolf commenced work, and before the catastrophe. Were the explosion thus caused it would most clearly be due, not to the ordinary dangers of the operation of the apparatus properly handled, but to the negligence of a co-employee of the plaintiff, from which, of course, liability could not result against the common employer. *Dahlke v. Illinois S. Co.* 100 Wis. 431; *Portance v. Lehigh Valley C. Co.* 101 Wis. 574.

With these two possible causes to account for the explo-

sion, the burden of proof, of course, rested on the plaintiff to prove the one for which the defendant would be liable. It did not suffice that one might be as probable as the other. It was not the situation of two possible causes, one or the other of which the jury *must* adopt, and, if they did not find Wolf's negligence established, must therefore assume the hypothesis of a defect. The existence and proximate effi- cacy of the defect was required to be established by reason- ably direct proof, while only the reasonable *possibility* of causation by Wolf's negligence need be proved to prevent presumption of a defect being necessarily drawn from the ac- cident itself. That possibility, as already stated, was proved without controversy. The sixth question, however, submits the two causes to the jury, for adoption of one or the other, as if they stood on an entire parity as to *quantum* of proof necessary to give either its legal effect. This was erroneous. The real jury question, had there been any evidence to jus- tify it, would have been whether the jury found a prepon- derance of reasonably direct evidence that leakage from the pipes caused the explosion, in view of the established possi- bility that it might have resulted from Wolf's negligence. That no such evidence existed was, however, entirely clear. The only attempted proof was the testimony of the chemical expert Prentice that "it is possible " for enough gas to make its way upward through such interstices in the floor to cause the explosion. On cross-examination, he said he had no idea of the time necessary; assumed a reasonable time; not a hun- dred years; had no idea of the quantity of gasoline neces- sary to create gas enough to fill the cellar. The defendant's expert chemist, Fisher, testified, without contradiction, that at least twelve hours would be necessary for the process of diffusion, and that a pint of gasoline produces about three and one-half cubic feet of gas, so that something like twenty gallons of gasoline must be evaporated to fill the space below the floor, without allowing for the very considerable outflow

through the cellar window. It was shown positively that no wastage of gasoline, certainly more than a few quarts, could have occurred. Thus, even the "possibility," in form testified to by Prentice, became an impossibility, in view of the known circumstances.

But, conceding the possibility that either such defect or negligence of Wolf was the efficient cause, choice between them could only have been based upon conjecture or guess. There was absolutely no evidence even tending to prove that the gas which exploded came from the basement and not from Wolf's burner. The submission to a jury of such choice has been universally condemned, and by no court more vigorously than by this. It is not consistent with the courageous assumption of responsibility and performance of judicial duty which litigants have a right to expect of trial courts. *Berlick v. Ashland S. & F. Co.* 93 Wis. 437, 445. If there is no reasonably direct evidence to establish the proximate efficacy of the cause alleged, the court should so decide, and should not, by submitting it to the jury, imply that the question is an open one. The present case is a forcible illustration of the burdens cast on litigants by the opposite course. Already the expense of two long and burdensome trials and of an appeal to this court has fallen upon each of the parties, whereof a very large part would have been saved by a definite ruling, as soon as the evidence was in, that the plaintiff had not shown, by any reasonably direct evidence, that defendant had been guilty of negligence which caused his injuries. This subject received exposition in clear and incisive language, and with full citation of authority, by MARSHALL, J., in *Hyer v. Janesville,* 101 Wis. 371, 377; which case was followed in *Gagan v. Janesville,* 106 Wis. 662, where we said: "The plaintiff must show by reasonably direct evidence that the defect, and not something else, caused the injury." See, further, *Hickey v. C., M. & St. P. R. Co.* 64 Wis. 649; *Spencer v. C., M. & St.*

*P. R. Co.* 105 Wis. 311; *Louisville Gas Co. v. Kaufman*, 48
S. W. Rep. 434.

The danger of a miscarriage of justice and of a verdict in
favor of the suffering plaintiff without evidence to support
it was enhanced in this case by the charge, which is in di-
rect disobedience of the rule so recently elaborated, that
where a special verdict is taken it is not only improper but
erroneous to instruct the jury generally upon the law of the
case and, especially, so as to give them information of the
legal effect of the answers to the special questions submitted.
*Kohler v. West Side R. Co.* 99 Wis. 33; *Ward v. C., M. &
St. P. R. Co.* 102 Wis. 215; *Baxter v. C. & N. W. R. Co.*
104 Wis. ·307, 318; *Fox v. Martin,* 104 Wis. 581–587; *New
Home S. M. Co. v. Simon,* 104 Wis. 120. In this case, where
seventeen questions were submitted to the jury going largely
into the detail of facts, we find no instruction which is ex-
pressly addressed to any one of those questions, but, on the con-
trary, an exhaustive charge as to the law governing the em-
ployer's responsibility, indicating fully what circumstances
would result in imposing and what in excusing from liability.
Especially as bearing upon the consideration of the sixth
question above discussed, we find the jury informed: "If you
should determine from the evidence that the injury to the
plaintiff was caused by the negligence of Charles Wolf in
and about his employment in operating an embossing ma-
chine in the same room in which the plaintiff was at work,
and further determine from the evidence that the defendant
exercised reasonable care and diligence in employing said
Wolf, *then the defendant would not be liable for the injury
complained of.*" This instruction clearly notified to the jury
that if in this field of conjecture, where, as already pointed
out, there was no direct evidence to compel them, however
conscientious, to say that one cause was proved rather than
the other, they adopted the second alternative, namely, the
careless handling of the burner by Wolf, they left the in-

jured plaintiff without remedy for his suffering, while, if
they adopted the other theory, they shifted onto the defend-
ant employer the burden of compensating him pecuniarily
therefor.   A jury can hardly be blamed, under such circum-
stances, for preferring and adopting that guess towards
which their human sympathies impel them.   Other instances
of the same vice in the charge might be pointed out, but, as
the subject has been so fully treated in the later cases above
cited (which, by the way, have emanated from this court
since the trial of the present case), and as the views we
have expressed upon the merits of the controversy are con-
clusive of the appeal before us, it is not deemed necessary
to enter upon a discussion of them.   The giving of such in-
structions was an error for which the judgment should be
reversed, but which is overshadowed by the predominant
mistake of treating the case as if there were any evidence
on which a jury might have held the defendant liable.

Other errors, going principally to the detail of the trial,
are assigned but only perfunctorily argued, and, for the rea-
son just above mentioned, we deem it unnecessary to discuss
or decide whether they are well assigned.   It is clear, for
the reasons above stated, that error was committed in refus-
ing to direct a verdict for the defendant and in refusing to
set aside the answers, certainly to the sixth, seventh, twelfth,
and fifteenth questions, for which error the judgment must
be reversed.

*By the Court.*— Judgment reversed, and cause remanded
for new trial.