HERSCHMAN, Administrator, Respondent, vs. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Appellant.

*January 11—February 7, 1922.*

*Railroads: Employees' passes: Refusal of conductor to honor: Remedies of employee: Attempt to continue journey: Death of employee: Evidence.*

1. An employee of a railroad company having an employee's pass which on its face entitled him to passage on a certain train, but who was refused passage by the conductor on the ground that a bulletin issued later than the pass prohibited the carrying of passengers on employees' passes on such train, had no right to attempt to ride thereon, but should have obeyed the orders of the trainmen and got off, even if he was caused considerable inconvenience.

2. In an action against the railroad company for the death of the employee, run over by the train after he had jumped on the rear steps of a sleeping-car under the trap door of the vestibule when he was refused passage, testimony that the

conductor had pushed deceased off the rapidly moving train is *held* incredible and contrary to reasonable probabilities and to the physical facts, in view of other circumstances in evidence.

· APPEAL from a judgment of the circuit court for Milwaukee county: WALTER SCHINZ, Circuit Judge. *Reversed.*

Action for personal injury brought by the plaintiff against the defendant to recover damages for the death of Vasile Surdican on the 4th day of April, 1915, a short distance south of Corliss station in Racine county.

The deceased, an employee of the defendant, together with one Russo, left Milwaukee on the 3d of April, 1915, to attend Easter services in a church of their denomination at Indiana Harbor, and on the evening of the 4th, upon arriving at the Union passenger station at Chicago on their return trip toward Milwaukee, boarded the Pioneer Limited train of the defendant company, which train was known as No. 1, leaving said station at 6:45 p. m. At the time Surdican had an employee's pass, which specified that it was not good on certain lines, trains, or on parlor cars, but train No. 1 was not excepted. It was claimed by the conductor of train No. 1 that shortly before the happening of the accident an official bulletin was posted by the company prohibiting the carrying of passengers on train No. 1 riding on employees' passes.

Shortly after the train left the station at Chicago, Conductor Hare, while collecting fares, notified Surdican that his pass was not good on that train and that he would be obliged to leave the train at the next stop. Up to this point there is little dispute in the testimony of the witnesses. Defendant claims that the first stop of the train was at Western avenue, an important junction of railroads, and that upon arriving at such station the brakeman, pursuant to a request of the conductor, ordered Surdican and Russo to leave the train, and that both, in obedience to such order, did leave, and that the train thereupon proceeded on its course northward toward Milwaukee.

The conductor testified that the first stop of the train was at Western avenue, which testimony was also corroborated by the fireman, Wallace; two porters, namely, Hunter and Locke, the brakeman, Streeter, and the engineer, Klumb. Brakeman Streeter testified that both Surdican and Russo alighted at the depot platform at Western avenue. On the other hand, Russo testified that the train did not stop at Western avenue, but that it stopped after the train had left the Chicago station about fifteen minutes, at a point which he described as looking like a wilderness.

The brakeman, Streeter, testified that after the train left Western avenue and had arrived at a station called Healey, he observed Surdican standing on the hand-rails or stirrups of two sleepers attached to each other, which hand-rails or stirrups were located a short distance below the platforms of the two cars. Observing that Surdican was in a dangerous position, Streeter claims he cautioned him not to get off and motioned to him to remain where he was, and that he thereupon pulled the whistle signal for the engineer to stop, and that the train stopped at Mayfair, a closed station, and that he then directed Surdican to board the train, and that he left him on the rear seat of the coach. None of the defendant's witnesses testified that they saw Russo again after leaving the train at Western avenue station. In addition to Brakeman Streeter, the conductor, the engineer, the fireman, and the two porters testified that the second stop of the train was at Mayfair. Such testimony of the employees of the company is opposed by that of Russo alone, who testified that the only time he or Surdican was removed from the train was when the train stopped in some lonely unsettled portion in the country along the right of way. Streeter further testified that when the train arrived at Corliss he again ordered Surdican off of the train, and that Surdican complied with such order and left the train; that at Corliss he passed along the east side of the train for the purpose of ascertaining whether or not there were any hot boxes, and that in doing so he would have discovered

any one riding on the east side of the train, standing on the stirrups between the two cars, next to the vestibule diaphragm, and that he did not see Russo standing next to the vestibule diaphragm between the two sleepers, in accordance with Russo's contention as hereafter detailed.

Russo testified that after he and Surdican had been put off in an uninhabited and dark spot along the right of way, Surdican, when the train started, crawled onto the rear steps of a vestibuled sleeper, under the trap door in the vestibule, and remained in that position until the time of the happening of the injury which resulted in his death. He also claimed that while Surdican occupied this position on the steps, he took a position upon the stirrups or hand-rails next to the vestibule diaphragm, resting one foot upon the stirrup attached to the platform of the car on which Surdican was riding and the other foot upon the stirrup attached to the platform of the next car to the rear, and that the two stirrups were between thirty and twenty-four inches apart.

After the train had left Corliss the conductor claimed that in passing from one car to another he saw a hat appearing above the window in the vestibule door, and that he thereupon proceeded to open up the trap door but that he saw no one, but heard a sound as though some object had fallen onto the gravel next to the train; that he then closed the trap, and upon arriving at Milwaukee telegraphed to the section foreman to patrol the track; and that Surdican was found with his skull crushed, and dead, lying alongside of the track.

Russo testified that after the train had passed Corliss a short distance, the conductor, in passing from car to car, saw him through the vestibule window, and that he thereupon opened the trap door over the steps on which Surdican was riding; that Surdican immediately rose to his feet on the second step from the bottom; that the conductor immediately grabbed hold of Surdican's chest and struck him a number of violent blows with his ticket puncher in the

face and upon the head; and that in the meantime he, Russo, passed from the position which he was then occupying, and while the train was going at the rate of between forty and fifty miles an hour, onto the lowest step leading to the platform, and that the conductor immediately gave him a violent push, as the result whereof he was thrown from the train.

As to the liability of the defendant, the case was submitted to the jury upon one question of the special verdict, in which the jury found that the conductor, while the train was in motion, north of Corliss, used such direct personal violence upon the body of Surdican as to cause the latter to fall from the train.

At the close of the testimony defendant's counsel made a motion for a direction of a verdict in defendant's favor, which motion was denied. Defendant's counsel also moved to change the answer of the jury to the above question from "Yes" to "No," and for judgment in defendant's favor notwithstanding the verdict, and for a new trial, all of which motions were denied, and judgment was entered in plaintiff's favor as above indicated. The refusal of the court to grant the motions above referred to, and the entry of judgment as stated, constitute defendant's assignments of error.

For the appellant there were briefs by *H. J. Killilea* and *Rodger M. Trump,* both of Milwaukee, and oral argument by *Mr. Killilea.*

For the respondent there was a brief by *Houghton, Neelen & Houghton* of Milwaukee, and oral argument by *Albert B. Houghton.*

DOERFLER, J. We have set out in the statement of facts the testimony in the case at some considerable detail, for the reason that the case presents almost exclusively a question of fact. Did the conductor, after the train passed Corliss, apply such force upon Surdican as to cause him to be thrown from the train, as the result of which he came to

his death? The conflict in the evidence on material points involved is so great that we are led to the inevitable conclusion that either the statements of Russo are false or that the testimony of the defendant's witnesses is false. They cannot both be the truth.

Ordinarily, apparently conflicting statements of witnesses may be properly reconciled, and wherever a possibility exists to reconcile such testimony it is the duty of the court to do so. The evidence in this case is beyond reconciliation. True, Surdican and Russo were not vagrants or vagabonds, but apparently hard-working and law-abiding members of the community, excepting only with respect to the matters and facts shown in the evidence in this case. Surdican was an employee of the defendant company, and, from the reading of his employee's pass, was entitled to passage upon train No. 1. However, there can be no controversy upon the fact that when Surdican was denied the right to travel upon this train it was his duty to abide by the orders of the trainmen, and to seek redress, if any he had, otherwise than by endeavoring unlawfully to become a blind passenger upon this train. It is unquestionably true that the action of the trainmen in refusing Surdican a passage on this train and in putting him off of the train resulted in great inconvenience to him. It is significant, to say the least, that the overwhelming testimony in the case sustains the evidence of the company's trainmen that this train stopped first at Western avenue station, and second at Mayfair, and that both Surdican and Russo were put off the train at Western avenue, and that Surdican was taken from his position of peril at Mayfair and invited to, and that he did, occupy a seat in the coach until the train arrived at Corliss.

In determining where the truth lies in this case we must take into consideration the testimony as a whole, including that which pertains to what transpired at the time of the happening of the injury as well as that which referred to occurrences prior thereto. It is true that the conductor, when he claims he discovered someone standing outside of

the vestibule door, may have had some feeling of resentment, in view of his previous experience with the deceased and Russo. However, these experiences, as is generally known, are not uncommon to trainmen on passenger trains. The conductor was an old and trusted employee of the company, having had seventeen years of experience as a passenger conductor, and having acted for five years as the conductor on the Pioneer Limited, one of the principal through trains on defendant's road between Chicago and Minneapolis. It must be admitted that as to what occurred at and immediately prior to the death of Surdican the testimony of Russo is opposed solely by the testimony of the conductor. If the testimony of Russo be true, then the conductor was guilty of murder in the first degree in applying violence upon Surdican while he was standing upon the steps of the platform in a perilous position while the train was moving at the rate of between forty and fifty miles an hour. If he wilfully pushed Russo from the train, as was testified to by the latter, he was guilty of an assault with intent either to do great bodily harm or to commit murder. If Russo was violently thrust from the train while it was going at the rate aforesaid, it is almost inconceivable that he should not have shared a fate similar to that of Surdican.

The actual facts as detailed in the evidence, taken in connection with the surrounding facts and circumstances and the undisputed evidence as to the speed of the train, together with the overwhelming impeachment of Russo's testimony as to what transpired before the accident happened, are so persuasive as to force us to the inevitable conclusion that Russo's testimony is incredible and against all reasonable probabilities.

In *Lee v. C., St. P., M. & O. R. Co.* 101 Wis. 352, 360, 77 N. W. 714, in an opinion of the court by Mr. Chief Justice CASSODAY, it is said:

"The only portion of the plaintiff's testimony upon which the verdict could stand is not only made incredible by all the evidence in the case, but is intrinsically improbable. . . .

In such cases the trial court, which is vested with a very broad discretion—far more so than this court,—should promptly set aside the verdict. *Badger v. Janesville Cotton Mills,* 95 Wis. 599, 70 N. W. 687; *Vorbrich v. Geuder & P. Mfg. Co.* 96 Wis. 277, 71 N. W. 434; *Maitland v. Gilbert P. Co.* 97 Wis. 476, 491, 72 N. W. 1124. Of course, this court has frequently sustained verdicts supported only by a single witness, whose testimony was in conflict with a number of other witnesses, but a verdict must be supported by credible evidence as to facts not intrinsically improbable."

In *Peat v. C., M. & St. P. R. Co.* 128 Wis. 86, 90, 107 N. W. 355, it is said by the court, Mr. Justice DODGE rendering the opinion:

"The meaning of the expression 'against all reasonable probabilities,' as rendering testimony incredible, was further explained in *Bourda v. Jones,* 110 Wis. 52, 60, 85 N. W. 671, 674, as follows: 'A sworn statement which is obviously false in the light of reason and common sense and facts within common knowledge is not to be received in court as true because some witness wilfully or ignorantly or recklessly so testifies.' And again, in *Beyer v. St. Paul F. & M. Ins. Co.* 112 Wis. 138, 88 N. W. 57: 'Testimony may be so in conflict with conceded and established physical facts as to be incredible for the reason that its truth is morally impossible or so improbable in the course of nature as to approximate impossibility.' When, however, any fact essential to a verdict is supported only by evidence thus rendered incredible, the setting aside such verdict is no longer discretionary with the trial court, but a duty, failure of which is error reviewable on appeal. *Flaherty v. Harrison,* 98 Wis. 559, 562, 74 N. W. 360; *Cawley v. La Crosse C. R. Co.* 101 Wis. 145, 150, 77 N. W. 179; *O'Brien v. C., St. P., M. & O. R. Co.* 102 Wis. 628, 78 N. W. 1084; *Musbach v. Wis. C. Co.* 108 Wis. 57, 68, 84 N. W. 36; *Bourda v. Jones,* 110 Wis. 52, 60, 85 N. W. 671, 674; *Ellis v. C., M. & St. P. R. Co.* 120 Wis. 645, 98 N. W. 942."

We therefore hold that Russo's testimony is incredible, contrary to all reasonable probabilities, and contrary to the

physical facts.   The judgment of the circuit court is therefore reversed, with directions to enter judgment in favor of the defendant dismissing plaintiff's complaint, with costs.

*By the Court.*—Judgment reversed.

ROSENBERRY and OWEN, JJ., dissent.