IVERSON, Administratrix, Appellant, vs. RETON, Respondent.

*September 17, 1926—April 5, 1927.*

*Partnership: Accounting as between deceased and surviving partners: Failure of partner to demand accounting: Laches: Negligence: Discretion of court: Allowance of fees to accountant.*

1. A surviving partner who alleged conversion of large sums of money and of property belonging to the firm by a deceased partner, over a long period of time, and who demanded an accounting, has the burden of proof, which he must sustain by evidence of a clear and satisfactory nature. p. 430.

2. The failure of a partner of more than ordinary business ability for some twenty-five years to demand an accounting or to object to the firm's system of bookkeeping before the death

of the copartner, who had charge of such matter, is *held* to preclude equitable relief in an action for an accounting in which, due to delays, the death of the partner, and other causes, it was impossible to do justice between the parties. p. 431.
3. In such circumstances, a court of equity will leave the litigants in the condition in which it finds them. p. 431.
4. In an action for a partnership accounting it is within the discretion of the court to direct payment of an expert accountant out of the proceeds of the partnership assets. p. 432.

APPEAL from a judgment of the circuit court for Portage county: BYRON B. PARK, Circuit Judge. *Affirmed in part; reversed in part.*

This is an appeal by the plaintiff, as administratrix, from an interlocutory judgment.

The action brought by the plaintiff prays for a partnership accounting. The cross-complaint of the surviving partner, *John Reton,* among other things alleges that the deceased partner, Iverson, during the existence of the copartnership, had charge of the financial affairs and the bookkeeping of the firm, and that during his lifetime he converted large sums and property belonging to the firm to his own use, and in the prayer for relief he also demands an accounting. *Aurilla M. Iverson,* the widow of the deceased partner, was made a party defendant in her individual capacity, it being alleged in the cross-complaint that she participated in her husband's acts in the conduct of the firm business and co-operated with him.

Iverson, the deceased partner, died on April 11, 1911, and the plaintiff's complaint was served on January 19, 1912. On the 29th day of January, 1913, the issue was referred by the court to one Franklin E. Bump to hear, try, and determine. On the 7th day of October, 1919, by agreement between the parties, an expert accountant, one Penner, was ordered by the court to examine the books and accounts of the partnership, and upon the trial before the referee such accountant was the principal witness.

The trial was concluded March 11, 1921, and on August 23, 1922, the referee's report and decision was filed. The examination of the accountant in an effort to extract and to build a statement covered a period of about three years, during which time he consumed about three hundred days in actual work, for which he presented a bill, which the referee allowed and ordered to be paid out of the partnership assets. During the meantime, between the appointment of the referee and the filing of his report, changes occurred in the attorneys interested, by death and change of residence. The World War also required Penner, the expert accountant, who was an officer in the army, to be absent from the state for a considerable period of time. The final judgment by the court was not entered until 1925, after the lapse of about thirteen years from the time of the commencement of the action.

Many of the facts in the case are undisputed and are found in the referee's report. Among the findings of fact are the following:

"That on August 2, 1886, the defendant *John Reton* (then about seventeen years of age) and his brother, Niels Reton (then about nineteen years of age), entered into a copartnership resting in parol for the purpose of carrying on the business of jewelers and dealing in watches, jewelry, silverware, glassware, fire-arms, musical goods, sewing machines, notions, etc., in the city of Stevens Point, Portage county, Wisconsin. . . ."

That this business was continued until September 16, 1886, when one S. S. Iverson, now deceased, who was then about thirty years of age, and who had for a considerable period of time theretofore been living and boarding at the home of the said Retons and their mother, was admitted to the firm as an equal partner; that this new copartnership also rested in parol, and no agreement was entered into for the continuation of the same for any definite period of time; that on June 27, 1902, said last named copartnership was

dissolved by mutual consent, said Niels Reton having withdrawn therefrom, he being paid for his interest the sum of about $1,700; and that the interest of the said Niels was thereupon transferred to the other two copartners.

That after the withdrawal of Niels the remaining partners continued the business under the same firm name and in the same way as theretofore, as equal partners, but that there were no written articles of agreement entered into, and no time limit fixed for the continuance of the business; and that during the entire existence of the firms above mentioned, up to the time of the death of Iverson on April 11, 1911, no settlement or adjustment of the affairs and accounts was ever had.

That the Reton brothers were practical jewelers, and devoted their time to this branch of the business almost exclusively; and that Iverson was intrusted with the absolute and exclusive management and control of all the assets, books of account, and financial transactions of the firms.

"That there is no evidence by any competent witness or otherwise that the said control and management of the books, accounts, records, and financial transactions of the said firm by the said S. S. Iverson was against the will or without the consent of his said partners and partnership, nor that they did not have access to the said books and records of said transactions and opportunity to examine the same. That neither the said *John Reton* or Niels Reton, nor after the latter's said withdrawal from the business the said *John Reton,* had any actual knowledge that the said S. S. Iverson was keeping the accounts and records or conducting the affairs of said copartnership in a negligent, improper, or wrongful manner; but that the said *John Reton,* by the use of reasonable diligence in the inspection of the books of accounts and records of said former copartnership and by reasonable inquiry, after the dissolution thereof June 27, 1902, could have ascertained the conditions of said business as the same had been conducted by the said S. S. Iverson now complained of by him."

"That the said books and records kept by the said S. S. Iverson were kept in such inaccurate, incomplete, negligent,

and wrongful manner and so imperfectly preserved by him that it was and is impossible to ascertain therefrom as of any time during the life of either of said copartnerships of which he was a member, the true state of the business and accounts thereof or of the said partners' several interests therein; . . . "

"That the said copartners at various times enlarged the scope of their business by the purchase of real estate consisting of farm lands and city lot property; that they took in trade for merchandise and purchased for cash a large amount of live stock and placed same upon said farm property, and from time to time sold and otherwise disposed of the same; that they purchased farm machinery and equipment and placed the same upon said farms and constructed buildings and otherwise improved and developed said farms; that all of said farm operations were in the direct and exclusive charge and management of the said S. S. Iverson; that the title of some of such real estate acquired and owned by said copartnerships was taken in the name of S. S. Iverson only and some in the name of the said *John Reton* only, but that such titles were held in trust for the said copartnership; that the title to other of said real estate was taken directly in the name of the said Reton Brothers & Company; that all of said real estate so acquired and owned by the said copartners at different times, together with all of the farm personalty and live stock on said farms, had been sold or otherwise disposed of and no longer belonged to said copartners, or either of them, at the time of the death of the said S. S. Iverson, except that described in the tenth and eleventh findings of fact following."

"That on the date of the death of the said S. S. Iverson, the said copartnership composed of *John Reton* and himself were the owners of record of the real estate and the store building thereon occupied by them as their business property, . . . and were also the owners of record of lots 1, 2, 3, 4, and 5 of block 8 of Central Addition to the city of Stevens Point. . . ."

"That on the date of the death of the said S. S. Iverson, the said copartnership composed of *John Reton* and himself were the owners of record of the farm referred to . . . as the 'Eau Pleine Farm,' . . . the recorded title of which had been in the name of the said S. S. Iverson, for said partnership, from the time it was acquired until September 16, 1910,

on or about which day the said S. S. Iverson, in wrong of the said partnership, and without real or adequate consideration therefor, executed a warranty deed thereof to *Aurilla M. Iverson,* his wife, which deed was delivered to her at some uncertain time prior to his death or was taken possession of by her after such death, and was kept secret from the said *John Reton,* and was not recorded until April 12, 1911, the day following the death of the said S. S. Iverson."

That on the 26th day of September, 1912, the stock of merchandise was sold at public auction, by order of the court, to Niels Reton, for $6,500.

"That the said copartnership . . . at the time of Iverson's death owned no tangible real or personal property or interest in such, other than that heretofore mentioned."

That the defendant *John Reton,* during the period of his copartnership with Iverson, engaged in other business not connected with the firm, as follows:

"In 1903 or 1904 in the state of Oklahoma, about ten months in 1906 in Peoria, Illinois, and on the Isthmus of Panama about three months; in 1907 in Peoria, Illinois, about two weeks; in 1908 in Peoria, Illinois, and Panama about two and one-half months; in the forepart of 1909 in Panama about one month; and from the latter part of 1909 to the latter part of 1911 in Panama about two years.

"That at no time during the life of the said S. S. Iverson, either before or after the dissolution of the said copartnership composed of *John Reton,* Niels Reton, and S. S. Iverson, did the said *John Reton* demand any accounting or settlement of the affairs, accounts, business, and interests of said last mentioned copartnership or of the accounts between the partners or the succeeding partners thereof, although the said *John Reton* had access to the books, accounts, and records thereof and could, with reasonable diligence used by him, have seasonably ascertained the fact or sufficient thereof to put him on inquiry relating to the wrongful or negligent acts, omissions of, and misappropriations of funds of said copartnership by the said S. S. Iverson for the period of its existence from the 16th day of September, 1886, to the 27th day of June, 1902, now complained of in this action, and could have seasonably taken such steps as might be

necessary to compel an accounting by the said S. S. Iverson and a settlement winding up the business and affairs of the said copartnership."

"That at the time of the death of said S. S. Iverson he was indebted to the said copartnership composed of said *John Reton* and himself in the sum of $4,966.13 over and above all just credits and setoffs, made up of the following items: . . .

"Net cash unaccounted for June 27, 1902, to April 11, 1911, $3,680.28; excess of his net withdrawals on his personal account over the net withdrawals of *John Reton* on his personal account for the same period, $1,285.85,— $4,966.13."

"That any and all facts put in issue by the pleadings in this action upon which specific findings have not hereinbefore been made have not been proven."

As conclusions of law, among other things, the referee limited the accounting from June 27, 1902, so holding that an accounting prior to that time was barred by the six-year statute of limitations. The remaining conclusions of law are in accordance with and based upon the findings of fact. Certain items undetermined, accruing after the death of Iverson, were left open for determination by the court.

The accountant made a separate statement of the affairs of the copartnership from the date of the withdrawal of Niels Reton to the death of Iverson, but he also prepared a statement which embraced the entire copartnership affairs between Iverson and the two Retons from 1886 to the time of the dissolution of the firm when Niels withdrew, and these two statements were introduced in evidence before the referee; but he having held that the six-year statute of limitations began to run at the time of Niels' withdrawal, and because the defendant was guilty of laches, the report merely included the account from 1902 to 1911.

The trial court, however, overruled the referee with respect to his holding on the statute of limitations and laches, and considered the entire account, covering a period of about

twenty-five years, and increased the amount for which the defendant was found liable by the referee to the sum of $27,771.77.

Further facts will be referred to in the opinion.

For the appellant there were briefs signed by *Fisher & Cashin* of Stevens Point, and oral argument by *William E. Fisher*.

For the respondent there was a brief by *Goggins, Brazeau & Graves* of Wisconsin Rapids, and oral argument by *R. B. Graves*.

The following opinion was filed December 7, 1926:

DOERFLER, J. It is to the credit of the profession that cases like the instant one (which has dragged its weary way along in the courts for a period of about thirteen years) are extremely scarce. At an earlier date in the history of the common law it not infrequently happened that cases were passed on from father to son and from one generation to another, and such occurrences afforded interesting subjects for satirical writers of fiction, having as their object the improvement in the administration of justice. In the course of time, due to the hearty co-operation on the part of both the Bench and the Bar, a radical change has been wrought, in favor of an early termination of litigation. Time plays havoc with the memory of man. Valuable documents oftentimes become lost, mislaid, or destroyed. Important witnesses die or remove far from the jurisdiction of the court. Long delays involve duplications of labor on the part of attorneys and of judges. It must be conceded that some of the delays appearing in this case were entirely justifiable. Attorneys have died, and others have removed from the state. The World War also played a part in the protraction of the litigation. But when all is said by way of excuse and mitigation which can properly be said, we cannot help but agree with the learned trial judge when he expressed a well-

deserved censure with respect to those delays which were un-warranted and inexcusable.

Most of the findings of the referee were approved by the trial court. The court held that the six-year statute did not begin to run in 1902, when Niels Reton withdrew from the firm, but from the time of the discovery of the fraud, after the death of Iverson. In that respect he overruled the findings and conclusions of the referee, and decided that the accounting should include the entire period from 1886 on. The court also supplemented the report of the referee by holding that by reason of the close connections of Iverson with the Reton brothers and their mother, and by reason of the differences in the ages between the two brothers and Iverson, a relationship of confidence and trust sprang up and was maintained, and that such relationship excused the Reton brothers in failing to inform themselves during this long period of time of the actual condition of the partnership affairs and in failing to demand an accounting, or in failing to sue for a dissolution of the firm.

While it is true that Iverson when he entered the firm was thirty years of age, and that the Reton brothers at that time were respectively nineteen and seventeen years of age, the latter soon arrived at their majority. A reading of the evidence in this case discloses and impresses one with the fact that the Retons were not of an average mental caliber, but that they were keen in their comprehension and understanding of business transactions, and occupied a position, from an intellectual standpoint, above that of the average person. Both of the brothers testified at the trial in a manner which precludes the conclusion that they were the confiding tools of Iverson. While the referee found that Iverson was a man of great intelligence and business capacity, there is no satisfactory evidence in the case to convince us that he had an extensive knowledge of bookkeeping, and the testimony of the bankers who expressed an opinion upon that subject

is entitled to very little weight in view of the actual physical facts that developed during the course of the trial.    It is nigh incredible to believe that *John Reton,* who was connected with the firm business for a period of about twenty-five years, at no time made inquiries as to the financial condition of the firm or as to his actual interest therein.    And what is said here of *John Reton* is equally applicable to Niels Reton with respect to the time that he was interested as a member of the firm.    The firm was organized for profit. It was not a family affair.    While Iverson was the business and financial manager and the bookkeeper of the firm, all of the partners had an equal interest in the business and in its success.    This firm during the entire period did not confine its operations merely to the conduct of a jewelry business.    They purchased and held, during various periods of time, numerous pieces of real estate.    They operated farms. They purchasèd, for the business, the real estate on one of the principal business streets in the city of Stevens Point, with the store building thereon, and also purchased other lots in said city.    They purchased live stock for the farms, and exchanged merchandise for live stock.    The financial and business affairs, therefore, of the company were extensive, and from the entries on the books and from other evidence it appears that their operations exceeded the sum of half a million dollars.    What these operations would amount to if all the transactions properly appeared upon the books it is impossible for any one to determine.

*John Reton* was a man of great business initiative.    On his own individual account he engaged in lumbering interests in Panama.    He also had interests in Oklahoma and in Illinois and in other places, and a considerable portion of his time was occupied in promoting such interests.    To hold that *John Reton* was an equal partner in this business for a period of twenty-five years, without inquiring or knowing at any time the approximate standing, from a financial stand-

point, of the firm, ignores entirely the element of self-interest which predominates in human nature.    Neither did *John* possess a simple, docile, and trusting character.    His testimony in the case evinces positiveness, determination, and even combativeness.    During this long period of time the books kept by Iverson were open for examination and inspection to both of the Retons while they were members of this firm.    For a period of about three years after Iverson's marriage, from about the year 1897, he devoted his time during the hours of the day to the conduct of his farm, known as the Karner farm, and on the evening of each business day he would call at the store and attend to the book-keeping.    During this period of time ample opportunity was afforded both of the Retons to make an examination and inspection of the books.    Everything apparently was open and above board.    Had there been any large wrongful withdrawals by Iverson from the firm assets, no one was better able to detect the same than these two brothers.

In connection with the firm business and his own individual business Iverson maintained bank accounts, and there is no pretext that the firm's deposit books, its check books, and its canceled vouchers were not at all times available to the Reton brothers.    The withdrawals of the Reton brothers, however, were made in cash, and it is not reasonably certain that all of their withdrawals were registered by proper entries in the books of the firm.    During the period of one entire year, if we rely upon the report of the accountant, *John Reton* withdrew from the firm the paltry sum of fifty cents, and during other periods his withdrawals were comparatively small and negligible.    Under these circumstances, taking full cognizance of the selfish instincts of the average man and the intellectuality displayed by these two brothers, the contention of the latter that during this long period of time they were in total ignorance and were content to remain in total ignorance of the financial condition of the firm and of their approximate interest in the

firm is contrary to all reasonable probability. *Herschman v. C., M. & St. P. R. Co.* 176 Wis. 209, 186 N. W. 613. Every small stockholder in a business corporation is interested in its financial condition, and when dividends are passed by the directors he is immediately prompted to make inquiry. Such being the fact in relation to a stockholder of a corporation, however small may be his holdings, what can be said of an active, equal copartner in a firm doing as extensive and varied a business as that conducted by the firm in the instant case? Every transaction of a copartnership is ordinarily the subject of the scrutiny of the active partners in the business, for, being an enterprise engaged in for profit, and being the source from which the partners not only secure a livelihood but an accumulation for the future benefit of each party interested, a failure to be alert at all times may result in disaster.

While an occasional inadvertence may occur, and while wrongful entries made upon the books by the bookkeeper at times may be overlooked or undiscovered, due to a relationship of confidence and trust existing between the copartners, it is incredible and contrary to all reasonable probability that a practice due to a general scheme of dishonesty involving the sum of upwards of $27,000, which includes innumerable transactions, could be pursued over a period of twenty-five years, not only without being discovered, but that the partners of the type herein involved should have made no inquiry with respect to their own interests during all this time; and it appears to us further not only highly improbable, but nigh impossible, that the defendant *John Reton,* to whom the books and records of the firm were at all times available, in a business in which he was an equal partner, should not during a period of twenty-five years have discovered the form of bookkeeping employed and its utter unavailability as a basis for determining the respective interests of the copartners. True, the defendant takes the position that he was ignorant of proper

bookkeeping methods. Assuming this to be true, his self-interest would naturally prompt him from time to time to seek advice upon this subject, and expert accountants were at all times available to him, and upon such he might have called for advice and assistance. Being ignorant himself of bookkeeping, he might have requested a statement from Iverson, to whom he intrusted the financial end of the business, and the conclusion is well nigh irresistible that the Reton brothers, during all times while they were members of the firm, were aware of the general bookkeeping scheme conducted by Iverson.

At the time when Niels Reton withdrew from the firm, in the year 1902, the financial condition of the business and the interests of each copartner therein were prominently brought to the fore. True, the referee found that the settlement then made was not based upon an actual accounting. The settlement, however, manifested a conclusion on the part of all of the copartners that Niels' net interest was not worth in excess of $1,700. The relationship of Niels to his brother *John* was not only one of business but also one of blood. Had he merely transferred his interest for this sum to *John Reton,* it might readily be argued that the blood relationship predominated, and that he was willing to make a great sacrifice in the interests of a devoted brother. In the purchase of Niels' interest, however, Iverson became the owner of an undivided one-half thereof, and the transaction, to say the least, constitutes an evidentiary fact with strong probative force that the amount paid for Niels' interest represented approximately its real worth.

The parties in this case have appealed to a court of equity in order that certain alleged wrongful acts may find a proper remedy. The burden of proof with respect to the allegations in the cross-complaint rested upon the defendant, and this burden must be discharged by evidence of a clear and satisfactory nature. "Equity delights to do justice," and the relief demanded, to a large extent, must appeal to the

conscience of the chancellor. Sitting here in judgment upon this case, as an appellate court and in the capacity of chancellors in an equity action, notwithstanding the findings of the referee and the decision of the trial court, we have come to the conclusion that by reason of the physical facts disclosed by the evidence, the attitude of the parties, and the incredibility of the testimony of the defendant and of Niels Reton, that the Reton brothers at all times while they were members of the firm having at all times had access to the books and records, and being of more than average intelligence, not only acquiesced in Iverson's system of bookkeeping, but that they impliedly, if not expressly, consented thereto. But it must be assumed that they at all times knew approximately the financial condition of the business; that they had at all times access to the books, and that nothing was hidden from them; that if they did not avail themselves personally of their rights to make an examination, they were authorized to have such examination made by accountants; that when Niels Reton withdrew from the firm, the financial condition of the same and the amount of its assets were prominently brought to their mind, and that when the interest of Niels was sold, the determination on the part of *John Reton* and Iverson was based upon an approximate valuation of the firm's net assets.

No accounting was demanded until after the death of Iverson, who during his lifetime was in a position where he might have given valuable aid and thrown light upon the various firm transactions and upon the entries appearing upon the books, and as to the various conferences held, if any, and conclusions arrived at from time to time of how the business stood, and what the interests of the copartners thereof were. The defendant and his brother have slept upon their rights until Iverson's death, and then a situation arose which made it impossible to do justice between these parties. In such a case a court of equity will leave the parties litigant in the condition in which they find themselves, a

condition wrought in part by their own acts and their own negligence. See *Lawrence v. Rokes,* 61 Me. 38; *Stout v. Seabrook's Ex'rs,* 30 N. J. Eq. 187; *Teipner v. Teipner,* 135 Wis. 380, 115 N. W. 1092. The *Teipner Case, supra,* discloses a situation very similar to that which exists in the instant case, and is ample authority for the conclusions arrived at by the court herein.

We are satisfied that the conclusions of the referee and the court in regard to the Eau Pleine farm are correct; likewise as to the findings with respect to the property situated in the city of Stevens Point, consisting of the store property and the lots.

We also affirm the judgment of the court in relation to the Karner farm property and the Ashland hotel property.

The judgment of the court with respect to the sale of the stock of merchandise and the allowance to *Aurilla Iverson* is also affirmed.

The order directing the payment of the expert accountant out of the proceeds of the partnership assets, being a discretionary order, is affirmed.

The judgment with respect to the accounting of the partnership transactions from the inception of the firm up to the time of its final dissolution, occurring upon the death of Iverson (except as herein stated), is reversed.

The decision of the trial court on all transactions in respect to the winding up of the partnership business, occurring since the death of Iverson up to the time of the entry of judgment, is expressly affirmed.

*By the Court.*—The judgment is affirmed in part and reversed in part, as above indicated, and the cause is remanded for further proceedings in accordance with this opinion.

A motion for a rehearing was denied, with $25 costs, on April 5, 1927.