REICHERT, Administratrix, Respondent, vs. REX ACCESSO-
RIES COMPANY and others, Appellants.
WOOLRAGE and another, Appellants, vs. REICHERT, Admin-
istratrix and another, Respondents.

*March 15—June 25, 1938.*

426

*Vilas H. Whaley* of Racine, for the appellants.

For the respondent in the first-entitled case there were briefs by *Gittings, Janecky & Buelow* of Racine, and oral argument by *Earl F. Buelow.*

For the respondents in the second-entitled case there was a brief by *Simmons, Walker, Wratten & Sporer* of Racine, and oral argument by *Harold J. Sporer.*

The following opinion was filed May 17, 1938:

MARTIN, J.   These actions arise out of an automobile collision which occurred in the city of Racine, November 3, 1936, at about 8:30 a. m., at the intersection of Wolff street and Green street.   Wolff street runs in an easterly and westerly direction, and is intersected at a right angle by Green street extending in a northerly and southerly direction.   Both streets are paved with a concrete surface.   Each is thirty-six feet in width, from curb to curb, the curb being six inches high.   The distance from the outer edge of the sidewalk to the face of the curb is six feet.   The width of the sidewalk, on either side of those streets, is six feet.   There is a public-utility pole located a short distance back from the curb line, in the space between the curb line and the sidewalk, at the southeast corner of the intersection.

Mr. Reichert's injuries resulted in his death soon after the collision, and as a result of the injuries sustained by Mr. Woolrage, he suffered a loss of memory, and on the trial was unable to give any testimony concerning the collision.   We have no eyewitness to the actual collision.

The appellants contend that the Chevrolet car driven by Mr. Woolrage had the right of way in the intersection; that it had passed the center line of Green street when struck at a right angle, on its left side, by the Ford truck being driven by Mr. Reichert in a southerly direction on Green street.

The respondents contend that Mr. Reichert approached the intersection from the west, intending to turn to his right (south), on Green street; that while he was in the act of making such turn, Mr. Woolrage suddenly attempted to pass to the right of the Ford truck, and while so passing or at-

tempting to pass, the collision occurred. Notwithstanding the verdict, we find no substantial dispute as to the following physical facts: There was no injury to any part of the front of the Chevrolet car. The principal point of impact was on the left rear side of the Chevrolet car, against the left rear door and that part of the left rear fender up to a point immediately to the top of the left rear wheel, and to the end of the left running board, at the point where it attaches to the left rear fender. The license plate on the Ford truck, attached to the center part of the front of the Ford, came in contact with the handle of the left rear door of the Chevrolet car, making a dent in the license plate corresponding exactly with the length of the handle, and leaving red paint on the outer surface of the handle. The license plate was so elevated on the brackets that by actual measurement the top part of the license plate was up even with the handle indentation made by the handle on the left rear door of the Chevrolet. The principal injury to the Ford truck was on the front right-hand side. The weight of the truck, without load, was two thousand nine hundred seventy pounds. The weight of the Chevrolet sedan was approximately two thousand eight hundred pounds.

A Mr. Anderson, engaged in the garage business in Racine, was called as a witness for the plaintiff-administratrix. On cross-examination he testified in part as follows:

"Most of the damage was at the right front corner of the Ford. All spokes were knocked out of the right front wheel. The spokes were made of steel probably one-fourth inch in thickness. That is pretty heavy steel and more durable than wood. I found no damage to the front of the Chevrolet. All of the damage was on either side of the car. . . .

"Q. What part would you say of the Chevrolet was struck by the Ford or do you know? A. Well, it's hit from the side.

"Q. That is the left side? A. Yes, sir.

"*Q*. With considerable damage right at the rear end of the running board on the left side? *A*. Yes, sir."

Matthew G. Andis, Jr., called as a witness by the plaintiff-administratrix, testified that he lived at 2700 Green street, at the northwest corner of the intersection of Green and Wolff streets. He heard the crash. He was then in the kitchen, finishing his breakfast. He could not see the intersection, and ran to the window, looked out, and saw the bakery truck was turned over on its right side and the other car was up against the southeast corner post. He was out at the intersection within a minute after the crash and stayed there for about a half hour. He was asked:

"*Q*. Where was the bakery truck after the collision? *A*. It was in Green street turned over on its side facing north and a little bit in the crosswalk and perhaps a little east on that side of the street on Green street.

"*Q*. You think it was on the east half of Green street? *A*. Yes, sir."

He further testified:

"I observed a lot of dirt scattered around and broken glass on the pavement. I did not see any skid marks."

On cross-examination he testified, in part, as follows:

"The debris I observed was in the southeast corner of the intersection. Both cars were in the southeast quarter or south of the intersection. The Ford lay about eight feet from the east curbing. The blood spot was about that distance from the southeast corner of the intersection. It was a little east of the center of the crosswalk on the south side of Wolff street and perhaps a little south."

Mr. Hjelmer Hanson, called as a witness in the first-entitled action, testified, in part, as follows:

"I live at 614 Wolff street three quarters of a block east of the intersection on the north side of the street. I did not see the collision. I was in the front part of the house near

the fireplace and heard a noise. I looked up and saw the cars still in motion but they were slewed around and up against the post at that time. I was not looking out the window when I heard the noise. The noise was very loud. I have a clear view of Wolff street between my house and the intersection. I can see fifty feet north and approximately one hundred and fifty feet south of the intersection and a block to the west. I saw no traffic on any of those streets immediately after the crash."

And on cross-examination he testified:

"They were just righting the Ford car when I got there but I did not assist. The driver of the Chevrolet got out of the car but I do not know where he went. I do not know his condition and did not converse with him. I didn't look for any marks in the street. The Ford was facing north on the east side of the street about ten feet from the curb. It was laying right on the south crosswalk. After the car was righted, it was about ten feet from the east curb of Green street. Before that it was laying up against the other car. The back end of the truck was up against the car. The blood mark was five to six feet from the curbing. The Chevrolet was over against the post at the southeast corner of the intersection. I was there until they pulled the truck away. The police officers were there when I arrived. I was there within ten minutes after the collision occurred."

Robert Burdick, called as a witness by the plaintiff-administratrix, who was the first person at the scene of the collision, testified, in part:

"I am sixteen years of age and attend high school. I was in Mike Boldis' backyard and heard the crash. I looked up and saw the Ford truck just turning around and saw the back end of the Chevrolet. I could see all of the Ford and I could see the back end of the Chevrolet as it was swinging around. My view was cut off by a garage. Both cars were still moving when I observed them after the crash. The Ford was pointing to the northeast when I first saw it and the Chevrolet was pointing a little on an angle, northeast. I did not hear any horn sounded. I always look up when I

hear a horn. After hearing the crash and seeing the cars, I jumped on my bicycle and went over there as fast as I could. There was no one at the intersection when I got there. The driver of the bakery truck was underneath it in the doorway and the driver of the Chevrolet was just getting out of the car on the east side. He walked about five feet and said, 'Look, look, quick, call the ambulance.' He went south on the east sidewalk to the first house. He went there alone. The Chevrolet car was up against the telephone post facing north. The Ford was laying right in the center part of the road with the wheels a little toward the left of the center line of Green street. The left side of the Ford was west of the center line of Green street. I placed the location of the Ford car too far to the right. As the car got closer to the curb I couldn't see it any more. When I last saw it, the automobile was facing in a northeasterly direction at an angle of about fifteen degrees. The Chevrolet was east of the Ford truck."

On cross-examination he testified, in part:

"The Ford was turned over on its right side. The driver's feet were underneath the car and his body was in the doorway. I saw a blood spot on the pavement. Defendants' Exhibit '9' is a picture of the blood spot in the corner of the pavement. The blood spot extended out from the curbing five to seven feet and that is where Mr. Reichert lay and the truck was turned up on its side. The easterly half of Green street is eighteen feet wide. I still think the wheels of the truck were extending over the center line of Green street. The blood spot was five to six feet from the east curbing and the body lay underneath the truck, near the south crosswalk."

It appears that the Burdick boy signed a statement, on November 5, 1936, which statement was offered in evidence at the trial. In this statement he said:

"The truck was toward the east side of Green street and the front end of the cab was just about in the south crosswalk of this intersection."

Mr. Wilbur Hansen, a sergeant on the police force, testified that the police department received a call at 8:31 a. m.,

relative to the collision in question; that he arrived at the scene of the accident approximately five minutes thereafter; that he took Mr. Woolrage to the hospital, and after leaving the hospital, he went back to the scene of the accident. The cars had not yet been taken away. He said:

"The only marks that I observed were on the southeast corner of the intersection. There was a pool of blood about eighteen to twenty inches in diameter. It was a little to the east of the center of the south crosswalk. Defendants' Exhibit '9' is a correct reproduction of the blood spot at the southeast corner of the intersection although I think the blood was washed away and left a mark or stain on the pavement."

Mr. Edward B. Yanny, the coroner of Racine county, testified that he went to the scene of the accident, arriving there before noon of that day. When he got there, the cars had been removed, and the fire department was cleaning the streets. He said:

"I checked in the homes for eyewitnesses and then went to the garage to check the cars. I saw Mr. Frohman there and talked to him. . . . I conferred with him both at his home and outside. . . . I can identify—the license plate and the automobile handle. The handle came from the Chevrolet car in the Goold street garage. I requested that it be removed from the car. I removed it myself. The license plate came from the Ford bakery truck. I kept those two exhibits in the vault in my office. . . . The red mark on the outer part of the handle is paint from the license plate. I can tell how the handle fit into the license plate. In my investigation, I found it fit perfectly with the indentation in the license plate. There was no inquest held."

Mr. Paul Frohman, a witness for the plaintiff-administratrix, testified that he lived at 1920 Wolff street, on the southwest corner of the intersection, his residence and garage being on the second lot from the west line of Green street, that shortly before the collision occurred, he was outside and saw the Reichert truck traveling in an easterly direction on Wolff

street. It was traveling between twelve and fifteen miles an hour. He testified that about ten seconds later, he saw the Chevrolet pass, traveling in an easterly direction, at a speed of between sixty and sixty-five miles an hour. From his position, he could not see the intersection, his view being obstructed by his garage, which was located sixteen and two-tenths feet east of his residence, but he heard the crash. The open space between the residence and garage is sixteen and two-tenths feet. His view north toward Wolff street was through this open space between the residence and the garage. He testified he had considerable driving experience; that he had operated and driven Dodge and Ford automobiles which were equipped with speedometers. On cross-examination he testified that the Chevrolet passed a couple of seconds after the bakery truck went by; that the truck was just about out of sight when the Chevrolet went by; that the truck was on the south half of the street.

"I can't say whether the left wheel was near the center of the street. I know that Reichert was on the right side. I paid particular attention to him but I didn't pay much attention to whether there was room for the Chevrolet to pass on the right. I do not know if there was room for another car to go between Reichert and the curbing. I didn't see the smashup. I could see sixty-three to sixty-five feet of the street from that point. I was facing north when I saw both cars go by."

He did not go immediately to the scene of the accident. He first went to the home of Officer Shulz and had him call the police department. Then he returned to his home, put on additional clothing, and then went to the scene of the accident. When he got there, the Ford truck was turned back on the wheels and the Chevrolet car was up against the utility pole. He further testified no horn was sounded. He could not tell on which side of Wolff street the Chevrolet was traveling as it passed his view.

Frohman was the last person to see the vehicles before the fatal crash. Whether the vehicles entered the intersection at the same time and, if not, which one was first to enter, and the movement of the vehicles therein, is a matter entirely of speculation. The physical facts tend strongly to support the appellants' contention that the Ford truck entered the intersection from the north, on Green street, but in view of the testimony given by Mr. Frohman that he saw both vehicles proceeding in an easterly direction on Wolff street immediately before the collision, that he was acquainted with Mr. Reichert and familiar with his truck, we cannot say that the physical facts outweigh his positive testimony, and, upon that issue, the jury finding must stand.

The appellants further contend that assuming the Reichert truck was traveling east on Wolff street, as found by the jury, the plaintiff-administratrix is not entitled to recover because, (a) Reichert, the deceased, failed to approach the point of turning in the traffic lane nearest the right-hand edge or curb of the highway, and in turning failed to keep as close as practicable to the right-hand curb, and therefore violated sec. 85.17 (1), Stats. 1935; (b) Reichert deviated from the traffic lane in which he was operating his car when such movement could not be made with safety to other vehicles approaching from the rear, contrary to sec. 85.16 (2), Stats. 1935.

Sec. 85.17 (1), Stats., provides:

"The operator of a vehicle intending to turn to the right at an intersection shall approach the point of turning in the traffic lane nearest the right-hand edge or curb of the highway and in turning shall keep as closely as practicable to the right-hand edge or curb of the highway."

Sec. 85.16 (2), Stats., provides:

"The operator of a vehicle upon a roadway shall not deviate from the traffic lane in which he is operating without first

ascertaining that such movement can be made with safety to other vehicles approaching from the rear."

In this connection, sec. 85.10 (34), Stats., defines "traffic lane" as follows:

"That portion of a roadway paralleling the center line of the roadway having a width of not less than seven feet and not more than ten feet, whether or not such portion is indicated by marks or markers."

With respect to these contentions, respondents argue that where there is no actual evidence as to what the deceased's acts or omissions were, the law presumes that he used due care, and that he was not negligent in those particular respects, for the law presumes that a person will use ordinary care to protect himself from danger, and that he will not knowingly nor consciously place himself in imminent danger because of the natural instinct of self-preservation. They cite *Rogers v. Lurye Furniture Co.* 193 Wis. 496, 211 N. W. 782; *Potter v. Potter,* 224 Wis. 251, 272 N. W. 34. The decision in the *Potter Case, supra,* refers to *Smith v. Green Bay,* 223 Wis. 427, 429, 271 N. W. 28. Referring in that case to the requested instruction as to such presumption, the court said:

"We are satisfied that the court properly declined to give it with respect to Oshkosh. The presumption to which the requested instructions relate only exists in the absence of actual evidence as to what the conduct of Oshkosh actually was. It disappeared upon the introduction of evidence establishing as a fact the negligence of deceased. Its function ceased when it had regulated the burden of going forward with such evidence and had been rebutted by actual evidence relevant to the issue. Plaintiff Oshkosh was not entitled to have this presumption thrown into the scales and weighed by the jury in finding the facts. This would give the presumption standing as actual evidence. That it is entitled to no such standing is well established. It is said in 5 Wigmore, Evidence (2d ed.), § 2491:

" ' . . . It must be kept in mind that the peculiar effect of a presumption "of law . . . is merely to invoke a rule of law compelling the jury to reach the conclusion in the absence of evidence to the contrary from the opponent. If the opponent does offer evidence to the contrary (sufficient to satisfy the judge's requirement of some evidence), the presumption disappears as a rule of law, and the case is in the jury's hands free from any rule.' "

The purpose of sec. 85.17 (1), Stats., is to protect those traveling in the right lane from sudden turns to the right by those traveling a left lane. *Ramsay v. Biemert,* 216 Wis. 631, 634, 258 N. W. 355. In *Balzer v. Caldwell,* 220 Wis. 270, 276, 263 N. W. 705, the court said:

"Upon a highway which is large enough for two cars to travel different paths, going in the same direction, and where it is lawful for one car to choose a path lying nearer the curb than that of the leading car, there is a duty on the part of the leading car not to obstruct the path of a car approaching from the rear by a sudden turn to the right."

It appears to be conceded that Reichert intended making a turn to his right at the intersection and go south on Green street. Thus, sec. 85.17 (1), Stats., is applicable. By the terms of this statute, he was required to approach the point of turning in the traffic lane nearest the right-hand edge or curb, and in turning to keep as closely as practicable to the right-hand edge or curb of the highway. We think the physical facts, as disclosed by the photographs and other evidence, not only overcome the presumption in favor of the deceased, but clearly show that he did not approach the point of turning in the traffic lane nearest the right-hand edge or curb of the highway and thus violated the statute.

If the Ford truck, as it approached the intersection, had been driven in the traffic lane nearest the right-hand edge or curb of the highway, and in turning to its right had kept as closely as practicable to the right-hand edge or curb, it would

have been physically impossible for the Chevrolet sedan to have squeezed through on the right side of the truck as respondents contend. It is significant that all witnesses agree that the physical marks found in the intersection immediately following the collision were all within the southeast quarter of the intersection. This case has given us considerable trouble. There was no eyewitness to the collision. Any reference in the testimony to the movement of the cars in the intersection was with reference to their movement after the collision had occurred. Mr. Reichert, the driver of the Ford truck, died immediately following the accident, without regaining consciousness. Mr. Woolrage, because of the injuries he sustained, suffered a loss of memory, and was unable to testify as to how the collision occurred or give any details in connection therewith.

It is argued by respondents that the material facts in a civil case may be established by circumstantial evidence. That is true. This court has repeatedly so held. But whether the essential evidentiary facts are sought to be established by circumstantial evidence or direct evidence, the degree of proof required must be such as will remove the ultimate facts to be found by the jury from the field of speculation and conjecture. Thus, it is said in *Anderson v. Chicago Brass Co.* 127 Wis. 273, 280, 106 N. W. 1077:

"It is well settled by a long series of decisions in this court that the party upon whom rests the burden of proof does not lift that burden by merely producing a preponderance of evidence. He may produce a preponderance, that is, he may produce evidence of slightly greater convincing power to the mind than that produced by his opponent, but still his evidence may be weak and leave the mind in doubt. In order to entitle himself to a finding in his favor his evidence must not only be of greater convincing power, but it must be such as to satisfy or convince the minds of the jury of the truth of his contention."

In *Hyer v. Janesville,* 101 Wis. 371, 377, 77 N. W. 729, the court said:

"In a case like this it is incumbent upon the plaintiff to show by evidence, with reasonable distinctness, how and why the accident occurred. *Morrison v. Phillips & C. Const. Co.* [44 Wis. 405]. To present two or more states of a case upon which a jury may theorize as to the real cause of the accident, putting one conjecture against another and determining which is the more reasonable, comes far short of making a case."

In *Creamery Package Mfg. Co. v. Industrial Comm.* 211 Wis. 326, 330, 248 N. W. 140, the court said:

"Preponderance of mere possibilities is, of course, not the equivalent of a preponderance of probabilities. Mere possibilities leave the solution of an issue of fact in the field of conjecture and speculation to such an extent as to afford no basis for inferences to a reasonable certainty, and in the absence of at least such inferences there is no sufficient basis for a finding of fact. It will not do to reach a conclusion in favor of the party on whom the burden of proof rests by merely theorizing and conjecturing. There must at least be sufficient evidence to remove the question from the realm of conjecture." To the same effect see *Wm. Esser & Co. v. Industrial Comm.* 191 Wis. 473, 211 N. W. 150; *Holborn v. Coombs,* 209 Wis. 556, 245 N. W. 673; *Seligman v. Hammond,* 205 Wis. 199, 236 N. W. 115; *Houg v. Girard Lumber Co.* 144 Wis. 337, 129 N. W. 633; *Chybowski v. Bucyrus Co.* 127 Wis. 332, 340, 106 N. W. 833; *Musbach v. Wisconsin Chair Co.* 108 Wis. 57, 84 N. W. 36; *Employers Mut. Liability Ins. Co. v. Brower,* 224 Wis. 485, 490, 272 N. W. 359.

The jury's finding that at the time of the collision Mr. Woolrage was acting within the scope of his employment as agent of the Rex Accessories Company is sustained by the evidence and that finding must stand. However, we are of the opinion that in the action of Lollie B. Reichert v. Rex Accessories Company, the defendants' motion for a directed

verdict should have been granted. Therefore the judgment in that action must be reversed with directions that the action be dismissed. In the action of James Woolrage v. Lollie B. Reichert there is a like failure of proof. Therefore, the judgment of dismissal will be affirmed.

*By the Court.*—The judgment in the action of Lollie B. Reichert v. Rex Accessories Company is reversed, and cause remanded with directions to enter judgment dismissing the action.

The judgment in James Woolrage v. Lollie B. Reichert is affirmed.

A motion for a rehearing was denied, with $25 costs, on June 25, 1938.