DETTMANN, Plaintiff-Respondent, v. FLANARY, and others, Defendants-Appellants.†

Supreme Court

*No. 76–084. Argued October 31, 1978.—Decided January 9, 1979.*
(Also reported in 273 N.W.2d 348.)

† Motion for reconsideration denied, with costs, on February 27, 1979.

There were joint briefs by *Irving W. Zirbel* and *Binder, Zirbel & Howard* of Milwaukee, for appellants, John

R. Flanary, M.D., S.C., and The Medical Protective Company, and oral argument by *Irving W. Zirbel;* and *John M. Swietlik* and *Kasdorf, Dall, Lewis & Swietlik* of Milwaukee, for appellants, Dr. Michael Gryniewicz and The Shelby Mutual Insurance Company, and oral argument by *John M. Swietlik.*

For respondent there was a brief by *Raymond E. Krek* and *Danforth, McKenna & Krek, S.C.,* of Jefferson, and oral argument by *Raymond E. Krek.*

COFFEY, J. This is a medical malpractice action wherein the jury found Drs. John Flanary and Michael Gryniewicz and their associated clinic negligent in the diagnosis, care and treatment of the plaintiff's breast cancer. Damages were awarded for past and future pain and suffering. The defendants' motions after verdict were denied by the trial court. The defendants' respective insurers, The Shelby Mutual Ins. Co. and The Medical Protective Co., were joined in the action and also participate in the appeal.

The plaintiff, Patricia Dettmann, was 27 years old when her third child was delivered in February, 1971. Dr. Flanary, an obstetrician-gynecologist, was the attending physician and the only physician the plaintiff had consulted in the previous six years. In March of 1971, while performing breast exercises, the plaintiff noticed that blood was being discharged from the nipple in her right breast. Mrs. Dettmann testified to doing a self-examination and she discovered a *"pea" sized lump in the upper right portion of her right breast.* The plaintiff alleges that she telephoned Dr. Flanary to inform him of this development. Dr. Flanary denies receiving a call from Mrs. Dettmann in March, 1971. To the contrary, the plaintiff stated Dr. Flanary returned the call and informed her that the condition would be reviewed at the scheduled post-natal examination on April 14, 1971.

At the April examination the plaintiff claims she informed Dr. Flanary of the condition. The plaintiff testified that the doctor tried and failed to express any bloody fluid from her right breast, and further, the cyst she described was not palpable. Mrs. Dettmann's testimony reveals the following: "He [Dr. Flanary] told me that if the bleeding recurs to the extent it had before, to come back immediately and he would take up, you know, a biopsy or have a pap test done from the fluid." The plaintiff also stated that the doctor informed her that the condition was nothing to be concerned about as it was associated with her recent pregnancy. Dr. Flanary denies receiving the complaint or making the alleged evaluation; this denial is substantiated by the absence of any notations to that effect in Dr. Flanary's office medical records of Mrs. Dettmann on that day. On August 3rd the plaintiff returned to the doctor's office complaining that she was experiencing discharges from her right breast. Dr. Flanary examined her and was unable to produce breast secretions. The medical records indicate that lumps were not found in either breast. The plaintiff claims Dr. Flanary stated that the bloody discharges were a result of the plaintiff's breast exercises. Dr. Flanary's office records reflect that on this date he advised the plaintiff to return immediately if the bleeding recurred so that a pap smear could be performed. The record establishes that Mrs. Dettmann did not experience a bloody discharge after the August 3, 1971 examination, nor did she return with any further complaints until October 10, 1972 when a second breast mass was found and subsequently determined to be cancerous.

The plaintiff's next office visit subsequent to the August 3, 1971 examination was on October 26, 1971 as she believed she was again pregnant. This examination was administered by Dr. Gryniewicz, also an obstetrician-

gynecologist specialist, who had recently joined Dr. Flanary's practice. Dr. Gryniewicz confirmed the pregnancy and performed a breast examination. The examination revealed *a lump in the upper* right quadrant of the plaintiff's right breast. Dr. Gryniewicz attributed the condition to Mrs. Dettmann's pregnancy, explaining the lump to be a benign milk duct cyst referred to as intraductal papilloma, a condition which would dissolve in due course. According to Dr. Gryniewicz the *size of the cyst was one centimeter by one centimeter.*

During the regular course of the plaintiff's pre-natal care, Mrs. Dettmann had eight appointments and was alternately examined by Drs. Flanary and Gryniewicz. During these eight pre-natal examinations Mrs. Dettmann did not have any complaints regarding the presence of the lump or bloody discharges. The plaintiff testified that the first lump found in March, 1971 was continuously present and readily palpable. The plaintiff's fourth child was born in February, 1972. Prior to and after the delivery, Dr. Flanary performed breast examinations on at least four or five occasions and found no masses or lumps. A hospital nurse examined the plaintiff's breasts daily following the delivery. The hospital records do not show that any breast irregularities were found during her confinement.

On June 13, 1972 Dr. Gryniewicz conducted a postnatal examination of the plaintiff and his records reveal that a breast examination established no definitive masses. Mrs. Dettmann returned to Dr. Flanary's clinic on October 10, 1972 complaining that a breast lump was growing and that after minimal exertion she was experiencing pain in her right arm. Dr. Flanary examined her and found a breast mass *in the sub-areola region of her right breast.*

The plaintiff was immediately referred to a general surgeon, Dr. William Kelley. On October 16, 1972, he

performed a biopsy based upon his examination and the plaintiff's medical history as related in Dr. Flanary's medical records. A pathologist diagnosed the biopsy sample as cancerous, whereupon Dr. Kelley performed a radical mastectomy. The pathologist reported the size of the cancerous lesion to be 4 by 3 by 2.2 centimeters, and further indicated the presence of carcinomic metastasis into nine of twenty-one lymph nodes in the plaintiff's lower armpit. The size of the malignant tumor removed was disputed by the medical experts. At trial, both Dr. Flanary's and Dr. Kelley's testimony as to the location of the mass differed from that given by the plaintiff who positioned the mass in the upper and outer quadrant of the right breast. This testimony is supported by the medical records relied upon by every expert appearing at trial.

After the mastectomy the patient was referred to Dr. John Hurley, a cancer specialist. He recommended an oophorectomy, a surgical procedure removing Mrs. Dettmann's ovaries in order to minimize the hormone stimulation upon the estrogen receptive cancer cells. Following the surgery she received cobalt and chemotherapy treatments. As a result of these surgical procedures and medical treatment Mrs. Dettmann made a remarkable recovery in that the cancer has been arrested with no apparent metastasis to other parts of her body. Conversely, evidence was introduced that for cancer patients suffering from lesions and nodular involvement such as Mrs. Dettmann's there is an 85% prognosis of an early death.

This appeal presents one issue for consideration:

Assuming the finding of negligence against the defendants, is there any credible evidence to support the jury's finding of legal causation that on or prior to October 26, 1971 the plaintiff had diagnosable cancer?

This medical malpractice action raises a question regarding a physician's liability for improper diagnosis

of breast cancer and its relation to causation for subsequent injury. Previously, this court has reviewed the issue of a doctor's liability for negligent diagnosis and the accompanying failure to render appropriate care and treatment in other cases of medical malpractice. *Dumer v. St. Michael's Hospital,* 69 Wis.2d 766, 233 N.W.2d 372 (1975) ; *Francois v. Mokrohisky,* 67 Wis.2d 196, 226 N.W.2d 470 (1975) ; *Knief v. Sargent,* 40 Wis.2d 4, 161 N.W.2d 332 (1968) ; *Carson v. Beloit,* 32 Wis.2d 282, 145 N.W.2d 112 (1966) and we have also considered whether "cancer-phobia" resulting from a physician's negligence is a compensable injury. *Howard v. Mt. Sinai Hospital, Inc.,* 63 Wis.2d 515, 217 N.W.2d 576 (1974). However, heretofore we have never been asked to consider whether a physician can be held liable for failing to diagnose an alleged cancerous condition of the breast, this failure to make a timely diagnosis allegedly resulted in inadequate care and treatment being rendered for a claimed malignancy.

The plaintiff maintains there was a single palpable lump in her breast from April 14, 1971 when she was examined by Dr. Flanary following her complaint of bloody discharges until October 16, 1972 when a cancerous mass was removed from her right breast. Further, the plaintiff's contention is that her attending physicians, specialists in obstetrics and gynecology, failed to perform the necessary procedures which required a surgical examination in order to evaluate the October 26, 1971 diagnosis made by Dr. Gryniewicz as a non-cancerous cyst. It is claimed that as a result of this failure the condition was not given timely and adequate care and treatment which has caused the plaintiff to suffer injury and pain to a greater extent than if the condition had been timely diagnosed and treated. The defendant doctors contend that notwithstanding the issue of negligence, the plaintiff failed to offer any credible evidence

that the alleged breach of a physician's standard of care as to diagnosis, care and treatment had a causal relation to the injuries suffered. They base this assertion on two grounds: (1) that the plaintiff did not prove the 1971 cyst was cancerous; and (2) that if the plaintiff did have cancer in 1971 the course of treatment undertaken by the defendant doctors did not cause the plaintiff to suffer greater injury.

After a review of the entire record it is our determination that the issue of the defendants' negligence need not be considered in reaching our decision. The record reflects a question at trial in regards to whether the plaintiff had introduced evidence sufficient to support a finding that the defendants' alleged negligence had caused Mrs. Dettmann's injuries. Accordingly, a special verdict was framed to meet the issue in dispute, and the following question was submitted in the special verdict:

"Did the plaintiff have diagnosable cancer on or prior to October 26, 1971?"

This question inquires into the causal relationship between the claimed negligence and the injuries suffered. Logically, there could be no finding of liability against Drs. Flanary and Gryniewicz if, on October 26, 1971, the lump in the upper and outer quadrant of Mrs. Dettmann's breast was not diagnosable as cancer on that date according to the standard of care of medical practice as applied to the facts in this case. Therefore, in depth consideration is not given to the jury's finding that the doctors were negligent in not referring the plaintiff to a general surgeon for a second opinion as to her breast condition. We review the issue of negligence only in its peripheral relation to the causal question of whether the plaintiff presented evidence to support the finding that her condition was diagnosable as cancer on October 26, 1971 and caused the injuries resulting therefrom.

For liability to follow negligence whether by a physician or another, the negligence must be the cause in fact or a substantial factor in causing the eventual injury:

"The instruction on whether the doctors' negligence was causal was perhaps too terse and on one interpretation not completely accurate. The instruction stated, 'You are instructed that a failure to make a correct diagnosis is not a cause of injury, damage, or death unless it was followed by improper treatment by Doctors Clark and Matthews.' The basis for this instruction is the language in *McManus v. Donlin* (1964), 23 Wis. (2d) 289, 295, 127 N.W. (2d) 22, 'An incorrect diagnosis is not actionable unless followed by improper treatment.' While a doctor does not guarantee or insure the correctness of his diagnosis he must use the proper degree of skill and care in making the diagnosis and if through the failure to use the proper degree of skill and care the diagnosis is an erroneous one, the doctor is negligent.

"However, a wrong diagnosis made through negligence to be actionable like any other specie of negligence must be a substantial factor in causing the injury of the plaintiff. Normally, the causation depends upon whether the treatment or lack of treatment resulting from the negligent diagnosis has done the harm or been a substantial factor in causing the injury to the patient. 'Improper treatment' as used in *McManus* is to be understood not only in a positive sense of what was done but also in the negative, *i.e.*, the lack of proper treatment or what was not done and which would have been done or given upon a correct diagnosis." *Carson v. Beloit, supra* at 291–92; *See also: Knief v. Sargent, supra.*

This proposition was more clearly stated in *Francois v. Mokrohisky, supra* where this court reversed a jury verdict finding a doctor negligent for an improper diagnosis of gallstones. In that case the physician relied on more than 30 x-rays before making the decision to operate and the operation proved that the plaintiff did not have gallstones. The court stated as to the legal requirement of causation in a medical malpractice action:

"Unless the untoward result was caused by the failure to conform to the accepted standard of care, he is not liable in negligence for damages." *Id.* at 201.

The plaintiff was unable to establish that the cyst in the upper and outer quadrant of her right breast was diagnosable as cancer in 1971 and the alleged failure to diagnose the same caused the "untoward result." This proof was required to establish the plaintiff's theory that the lack of a referral at that time to a general surgeon for examination caused greater injury. The plaintiff's testimony stands alone that the breast lump found by Dr. Gryniewicz in October of 1971 and the cancerous mass removed by Dr. Kelley in October of 1972 were the same. Mrs. Dettmann testified that the same lump was readily palpable in April and August as well as from October, 1971 through October, 1972. The overwhelming medical evidence is to the contrary, that the mass removed in 1972 was a separate and distinct cyst from the lump referred to in Mrs. Dettmann's testimony and palpated in 1971 by Dr. Gryniewicz.

Mrs. Dettmann described the lump in October, 1971 to be "pea sized." Dr. Gryniewicz's medical records indicate the size to be one by one centimeter. Mrs. Dettmann and Dr. Gryniewicz testified the 1971 cyst was located in the upper and outer right quadrant of the right breast and away from the nipple area. The cancerous mass removed in 1972 was 4 by 3 by 2.2 centimeters in size, but taking into consideration the healthy tissue which borders the malignant tumor on excision, the lesion's minimal size was estimated by medical testimony to be 2 by 2 by 1 centimeters at the time of the surgery in 1972. Additionally, the tumor removed in 1972 was located in the sub-areola portion of the breast or, in lay terms, beneath the nipple, a distance from the original 1 by 1 centimeter tumor described by the plaintiff.

Despite the plaintiff's testimony claiming the continuous presence of the same lump for over a year and

one-half, the medical testimony is undisputed that this phenomena of cancer growth is scientifically and medically impossible. The medical conclusion is based upon the following factors: (1) the differing locations of the two masses; (2) that the primary site of cancerous masses do not move or disappear; (3) that the 1971 cyst disappeared such that it could not be found by breast examinations performed in the hospital before and after the delivery of her child or at the post-natal exam in June, 1972; and (4) the growth rate of breast cancer.

The plaintiff called as an expert Dr. William Kelley, the surgeon who performed the 1972 biopsy and mastectomy. He testified that the incision was made at the outer aspect of the areola and would not have been made in that location had the lesion been present in the upper and outer breast quadrant as claimed by Mrs. Dettmann. His testimony is unequivocal that there were two different masses. Following Dr. Kelley's testimony, the plaintiff asked that Dr. Kelley be declared a hostile witness.

The plaintiff's second medical witness, Dr. C. Weir Horswill, a Madison obstetrician-gynecologist, testified that from a review of the medical records the lesion removed on October 16, 1972 was a different mass than the one discovered in 1971. Consistent with the hospital records during Mrs. Dettmann's delivery in February, 1972 wherein daily breast examinations revealed no lumps, Dr. Horswill testified that a cystic mass associated with pregnancy disappears following the pregnancy but that a cancerous tumor would not. He stated his agreement with an authoritative text on breast disease[1] which stated in the case of women under 30 years of age (plaintiff was 27 years of age) 89% of the time nipple discharge is caused by factors other than cancer and in 68% of the cases it is caused by intraductal papilloma, a

---

[1] Haagensen, *Diseases of the Breast,* Second ed. (1971).

non-cancerous, milk duct cyst associated with pregnancy which will disappear following the pregnancy. Further, Dr. Horswill testified, based upon the evidence, combined with the two different cyst locations (one in the upper and outer breast quadrant and the other behind the nipple) and that cancerous lesions do not spontaneously disappear and the primary site does not move, he has no way of knowing whether Mrs. Dettmann had cancer on October 26, 1971.

The next expert appearing for the plaintiff was Dr. Johnson, a noted cancer specialist. He stated the normal cancer growth rate is that it will double in four to six months. He testified that given the average growth rate for cancer, if the one by one centimeter cyst in 1971 was the same as the tumor removed in 1972, the growth would have been in excess of six centimeters in October, 1972. He added that the cancer growth rate is increased during pregnancy since estrogen receptive cancer cells feed upon and grow more rapidly because of the greater hormone secretions caused by pregnancy. His opinion is also unequivocable that the mass that Mrs. Dettmann described was a different breast mass than was removed in October, 1972.

A defense witness, Dr. Addis Costello, an internist, corroborated earlier testimony that cancers do not move or disappear whereas a benign cyst resulting from intraductal papilloma will disappear as nature heals the lesion causing the bloody discharges. He was the fourth medical witness to give his opinion that there were two separate masses involved.

Dr. John D. Hurley, a prominent cancer specialist, gave this opinion for the defense: that the breast mass removed in 1972 was a separate and distinct mass from the growth discovered in 1971 because the growths were in anatomically different locations; that a pregnancy will make a cancerous tumor grow more rapidly such that it

is scientifically impossible for a one by one centimeter mass to be in the breast of a pregnant woman from October, 1971 until June, 1972 without growing to a size of at least eight centimeters; further, that cancerous breast lesions do not disappear or dissolve. Dr. Hurley also rendered the scientific opinion that the growth removed in October, 1972 could have developed after June of 1972 at the time Mrs. Dettmann's breasts were examined at her post-natal physical.

As a court of review, a jury verdict is to be assessed in light of the following standards:

"We are mindful of the often stated rule that if there is any credible evidence under any reasonable view or any reasonable inferences derived therefrom that support a finding of fact by the jury that neither trial court nor this court should change that answer. Conversely it can be said if there is no such evidence either court can change the answer as a matter of law." *Lueck v. City of Janesville*, 57 Wis.2d 254, 262, 204 N.W.2d 6 (1973) *citing: Hall v. Arthur Overgaard, Inc.* (1972), 55 Wis.2d 247, 198 N.W.2d 605; *Paul v. Hodd* (1955), 271 Wis. 278, 73 N.W.2d 412; *Thorp v. Landsaw* (1948), 254 Wis. 1, 35 N.W.2d 307.

Under this standard, Mrs. Dettmann's testimony is not credible evidence. The medical testimony and evidence leaves no doubt that the cyst palpated by Dr. Gryniewicz on October 26, 1971 and the cancerous tumor removed on October 16, 1972 were not the same.

While it has been stated that a jury may draw legitimate inferences from physical facts described by a non-expert,[2] in a medical malpractice suit a lay opinion as to the existence of a physical fact cannot stand against undisputed expert testimony that the physical fact described by the non-expert is scientifically and medically impos-

[2] *Vogel v. Vetting*, 265 Wis. 19, 24, 60 N.W.2d 399 (1953).

sible.[3] Mrs. Dettmann's testimony as to the single cancerous mass theory is not credible evidence. We conclude as a matter of law Mrs. Dettmann's testimony was incredible and therefore cannot support the inferences tive insurers, The Shelby Mutual Ins. Co. and The Medical sustaining the verdict. This court has defined incredible evidence in the following manner:

" 'Incredible evidence is evidence in conflict with the uniform course of nature or with fully established or conceded facts. *Davis v. Skille* (1961), 12 Wis.2d 482, 107 N.W.2d 458; *Czerniakowski v. National Ice & Coal Co.* (1948), 252 Wis. 112, 31 N.W.2d 156.' *Zillmer v. Miglautsch* (1967), 35 Wis.2d 691, 698, 699, 151 N.W. 2d 741. *See also: Phoenix Ins. Co. v. Wisconsin Southern Gas Co.* (197C), 45 Wis.2d 471, 484, 485, 173 N.W. 2d 610." *Tombal v. Farmers Insurance Exchange,* 62 Wis.2d 64, 69, 214 N.W.2d 291 (1974).

The evidence supplied by both plaintiff's and defendants' medical experts support each other in establishing that the lump present in Mrs. Dettmann's upper and outer breast quadrant was not diagnosable as cancerous on October 26, 1971. The growth and diagnosis of cancer is a matter beyond the knowledge and experience of a layman such that medical testimony was required to establish the cancerous condition found in 1972 existed in October of 1971 and that it was diagnosable as cancer pursuant to accepted medical practice and procedure. Since there is no credible evidence that the mass originally reported is the same as that which proved to be cancerous, there can be no causal relationship between the original cyst reported by Mrs. Dettmann in 1971 and the cancerous tumor removed in 1972.

Dr. Johnson's testimony reveals an alternate theory of liability which it is claimed supports the jury verdict. He stated that in 1971 "I think it is probable that cancer

[3] *Bartell v. Luedtke,* 52 Wis.2d 372, 379, 190 N.W.2d 145 (1974).

was there at this time." It was his theory that a minute, microscopic cluster of malignant cells beneath the areola developed into the tumor removed in 1972. This theory, if viewed in the light most favorable to upholding the verdict, raises the issue of whether the described microscopic condition was capable of diagnosis by accepted medical practice and procedure in 1971. The collective testimony of the medical experts appearing at the trial indicates that in 1971 the diagnostic procedures available for breast cancer were palpation, aspiration, a pap smear, xerography or mammography, biopsy and mastectomy.

Dr. Johnson's own testimony dismisses palpation and aspiration as viable diagnostic procedures in this case in the following language, given in response to questioning:

"Q. Okay. Now, Doctor, just follow me if you will. In October of '71, I believe you testified previously that your best estimate was that if you could make an estimate, that the size of the cancer in October of '71 was such that it would not be palpable, is that correct?

"A. Millimeters certainly may not be palpable.

"Q. You certainly couldn't aspirate it?

"A. Under those circumstances, it would be difficult. It would be extremely difficult.

"Q. It would be almost impossible?

"A. In '71, yes, it would have been; yes."

Dr. Horswill, the plaintiff's expert, suggested that Dr. Flanary's recommendation to perform a pap smear if the discharges continued was in conformity with accepted medical practice. The record reflects no fluid could be expressed from Mrs. Dettmann's breast, nor did she return with additional complaints of spontaneous discharge. Thus, without fluid from a breast discharge it was impossible to perform a pap smear that would analyze the breast condition eliminating the use of this diagnostic procedure in this fact situation.

Regarding the use of a mammography or xerography as a means to diagnose this potential condition, it was Dr. Johnson's opinion that the mass if any in 1971, was

too small to appear on a xerogram or mammogram. Additionally, there was conflicting expert testimony as to whether a mammography was an advisable procedure by virtue of the plaintiff's pregnancy. A radiologist concluded that under no circumstances should a mammogram be given to a woman in her first trimester due to the effects of radiation on the fetus. Dr. Horswill stated that the chances for harm are reduced if a lead shield is placed over the abdomen. A radiologist appearing for the plaintiff stated he could not guarantee that nothing would happen to the fetus and acknowledged his adherence to a National Cancer Institute publication, stating "mammograph may take almost as many lives as it saves." Dr. Hurley stated a mammogram was ill-advised for a pregnant woman and most likely ineffective due to the density of the breast in a woman under 30 years old.

Drs. Johnson's and Hurley's testimony agreed that a biopsy could only be performed if the source of the nipple discharge was discovered. In this case. Dr. Flanary could not express the breast fluid from any quadrant of the breast. As a matter of logical deduction and based upon expert testimony if a breast biopsy had been performed in October of 1971, it would have been done in the upper right quadrant of the breast rather than the areola region. Dr. Kelley's testimony points out that had the 1971 cyst been biopsied, the sample would not have exposed the malignant growth behind the nipple, since the biopsied region was a distance from the location of where the 1972 lesion was excised.

Dr. Johnson's testimony rejects a mastectomy as the appropriate diagnostic technique and thus not warranted with Mrs. Dettmann's medical history and symptoms. Dr. Johnson explained the alternative in the following terms:

"*Q*. Doctor, in a case where a woman comes in with a complaint of a bloody discharge which the physician

is unable to express and instructs her to report back if there is any further discharge, but in which no further discharge has ever occurred, can you tell me how the physician can tell what part of her breast is involved in this bloody discharge?

"A. He cannot. There is—you have only what the doctor can find or what the patient can tell you or, for example, what the husband can tell.

"Q. All right. If you had none of those present, the only way to find out what is going on in her breast would be to remove the whole breast and examine it?

"A. That is correct.

"Q. Which, in effect, Doctor, would amount to a modified mastectomy, wouldn't it?

"A. It would be a simple mastectomy.

"Q. Do you advocate a simple mastectomy in the case of a patient who has a complaint on one occasion to her doctor of a bloody discharge off and on for two weeks?

"A. No, I do not."

Additionally, Dr. Johnson wavered in his opinion whether Mrs. Dettmann had cancer in 1971. After explaining the grave prognosis in cases such as the plaintiff's and noting how well she has responded to treatment insofar as there has been no carcinomic metastasis, he stated:

". . . the other possibility is that she did not have cancer during her pregnancy."

Undoubtedly, Dr. Horswill's testimony highlights the legal deficiencies to Dr. Johnson's theory of liability based upon a cancerous condition separate from the breast mass palpated in October of 1971. The obstetrician appearing for the plaintiff stated:

"I have no way to know whether or not, if Mrs. Dettmann had been referred out to a consultant, it would have made any difference in the outcome of this case."

Thus, the medical testimony is more than persuasive that a referral to a general surgeon for further diagnostic procedures would not have aided in the diagnosis

or treatment of the cancerous condition of 1972. The record is absent expert testimony supportive of the plaintiff's theory of causation that there was available diagnostic or medical procedures which would have disclosed the cancer, if any, in the areola area, except a simple mastectomy. This procedure was found to be medically unacceptable by the plaintiff's general surgeon, Dr. Johnson, after reviewing the case history and findings. Thus, the plaintiff has failed in establishing a causal relation between the claimed negligent diagnosis of 1971 and the injuries resulting from the malignancy of 1972.

We give credence to the language in *Ernst v. Greenwald,* 35 Wis.2d 763, 151 N.W.2d 706 (1967) where it is stated:

"The plaintiff, however, has the burden of proof; and in the event that there is a failure of proof, as we conclude there exists in this case, the verdict can only be based on speculation and, therefore, is not entitled to the application of the rules set out above. We have stated:

" '. . . the degree of proof required must be such as will remove the ultimate facts to be found by the jury from the field of speculation and conjecture.' *Reichert v. Rex Accessories Co.* (1938), 228 Wis. 425, 439, 279 N.W. 645.

"We stated in *Creamery Package Mfg. Co. v. Industrial Comm.* (1933), 211 Wis. 326, 331, 248 N.W. 140:

" 'It will not do to reach a conclusion in favor of the party on whom the burden of proof rests by merely theorizing and conjecturing. There must at least be sufficient evidence to remove the question from the realm of conjecture.' " *Id.* at 773.

Therefore, after a thorough review of the testimony we hold that the plaintiff has failed to prove that the alleged negligence was a substantial factor in causing the "untoward result" and thus the jury verdict finding Drs. Flanary and Gryniewicz liable for the injuries sustained must be set aside. Any theory of liability in this case

enters the realm of conjecture and speculation due to the absence of medical testimony supporting the plaintiff's required burden to meet the accepted standards of legal causation.

*By the Court.*—Judgment reversed and cause remanded for a dismissal of the complaint.